**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| | : | |
| **DENISE MASLOW, LINDA WELLER,** | : | **No. 01-CV-3636** |
| **MARY DOE, NANCY DOE, and L.H.,** | : | |
| **Plaintiffs** | : | |
| | : | **CONSOLIDATED CASES** |
| **v.** | : | **No. 00-CV-5660** |
| | : | **No. 00-CV-5805** |
| **MICHAEL K. EVANS, PAUL J. EVANKO,** | : | **No. 01-CV-1538** |
| **THOMAS COURY, HAWTHORNE** | : | **No. 01-CV-2166** |
| **CONLEY, ROBERT G. WERTS,** | : | **No. 01-CV-3636** |
| **THOMAS J. LACROSSE, ROBERT B.** | : | |
| **TITLER, DAVID B. KREISER, DENNIS** | : | |
| **HUNSICKER, KEVIN T. KRUPIEWSKI** | : | |
| **and GARY FASY,** | : | |
| **Defendants** | : | |
| | : | |

**MEMORANDUM  OPINION  AND  ORDER**

**RUFE, J.**                                                          **November 7, 2003**

Presently before the Court are the Motions for Summary Judgment of Pennsylvania State Police Commissioner Paul J. Evanko, Deputy Commissioner Thomas Coury, Major Hawthorne Conley, Major Robert G. Werts, Captain Thomas J. LaCrosse, Captain Robert B. Titler, Lieutenant David B. Kreiser, Lieutenant Dennis Hunsicker, Sergeant Kevin T. Krupiewski, Sergeant Gary Fasy,[1] Corporal Gary L. Dance, Jr., Corporal Laura Bowman, Corporal Douglas R. Brose, Corporal Robert L. Murray and Trooper David Seip (hereinafter collectively "PSP Defendants" or "Defendants"). Former Pennsylvania State Police Trooper Michael K. Evans is also named as a defendant but has not filed a case dispositive motion. For the following reasons, the Motions are granted in part and denied in part.

---

[1] Although Fasy's Motion for Summary Judgment is filed separately from the other PSP Defendants, the two motions are, in all material respects, identical.

This consolidated action[2] stems from the civil rights claims of several female citizens against the PSP Defendants as the result of the sexual misconduct of former Pennsylvania State Police Trooper Michael K. Evans between July 1997 and September 1999.  On October 3, 2000, Evans pleaded guilty to eleven counts of criminal conduct, including solicitation to promote prostitution, corruption of morals of a minor, indecent assault, indecent exposure and official oppression as the result of his on-duty sexual misconduct with six female victims.[3]  Before the Court are the PSP Defendants' Motions for Summary Judgment with respect to the claims of Plaintiffs Denise Maslow, Linda Weller and Nancy Doe.[4]  The PSP Defendants assert that qualified immunity bars Plaintiffs' constitutional claims and that the doctrine of sovereign immunity bars all state law claims against them.  Plaintiffs counter that the PSP Defendants were repeatedly put on notice of Trooper Evans' sexual misconduct and that they acted with deliberate indifference in failing to properly supervise, instruct, train, counsel and discipline him.  Because the PSP Defendants' legal obligations were clearly established, Plaintiffs argue, they are not entitled to any immunity.

---

[2] By Order dated August 10, 2001, the Court consolidated for all purposes Weller v. Evanko, No. 00-CV-5660; L.H. v. Evanko, No. 00-CV5805; Mary Doe v. Evanko, 01-CV-1538; and Nancy Doe v. Evans, No. 01-CV-2166 with Maslow v. Evans, 01-CV-3636.  On June 14, 2002, all five cases were reassigned to the undersigned in accordance with the Eastern District of Pennsylvania's procedure for random reassignment of cases.

[3] Evans is currently serving a five-to-ten year sentence at the State Correctional Institute at Waymart as a result of those convictions.  Evans' guilty plea precludes him from disputing liability in this case under the principles of *res judicata* and collateral estoppel.

[4] Plaintiffs filed a Consolidated Response to Defendants' Motion for Summary Judgment in which all five opposed the entry of judgment in favor of the PSP Defendants.  Since then, Plaintiffs Mary Doe and L.H. have settled with Defendants, and the Court has entered orders dismissing with prejudice Case Nos. 01-CV-1538 and 00-CV-5805.  Thus, to the extent that the pending motions relate to the claims advanced by Mary Doe and L.H., the Motions are denied, in relevant part, as moot.
In their consolidated response to Defendants' Motions, Plaintiffs stipulate to the dismissal of all claims advanced pursuant to 42 U.S.C. §§ 1985(3) and 1986.  They further agree to voluntarily dismiss all claims against Corporal Laura Bowman, Corporal Gary Dance, Corporal Robert Murray, Trooper David Seip and Captain Robert B. Titler.  Accordingly, the § 1985 and § 1986 claims and the claims against said Defendants shall be voluntarily dismissed in accordance with Federal Rule of Civil Procedure 41(a)(2).

Plaintiffs further assert that the Pennsylvania State Police (the "PSP") had official customs and policies, including internal hiring and investigation procedures, that demonstrate deliberate indifference to the constitutional rights of persons such as Plaintiffs. Plaintiffs also allege a civil conspiracy.[5]

## MOTION TO SUPPLEMENT THE RECORD

Before the Court sets forth the factual background, it is appropriate to address Plaintiffs' Motion to Supplement the Record. Plaintiffs Denise Maslow, Linda Weller, and Nancy Doe ask for permission to supplement the record with 47 Bureau of Professional Responsibility ("BPR") General Investigation Reports that were not included in the five volumes of exhibits submitted with Plaintiffs' Consolidated Response to Defendants' Motion for Summary Judgment. This Court recently discussed the subject BPR reports in a challenge to an order temporarily sealing them in Haber v. Evans, 268 F. Supp. 2d 507 (E.D. Pa. 2003). Plaintiffs submit that the BPR reports are directly relevant to their § 1983 claims and that they provide additional factual support for the positions asserted in opposition to the PSP Defendants' Motions for Summary Judgment.

The BPR reports may be relevant to the supervisory liability claims against officials at the top of the chain of command, namely Commissioner Evanko, Deputy Commissioner Coury and Major Conley, if Plaintiffs can establish a pattern of lenient distribution of punishment against

---

[5] In a Memorandum and Order dated March 22, 2001, in Weller v. Evanko, No. 00-CV-5660, the Honorable Stewart Dalzell dismissed Weller's false arrest claims to the extent that they sought relief under the Fifth and Fourteenth Amendments. Judge Dalzell also dismissed all claims against the PSP Defendants in their official capacities, marked as withdrawn a Violence Against Women Act claim and dismissed with prejudice a § 1983 claim advanced on behalf of Weller's minor child. See Doe v. Evanko, No. Civ.A.00-5660, 2001 WL 283170 (E.D. Pa. Mar. 22, 2001). In a Memorandum and Order in L.H. v. Evanko, 00-CV-5805, the Honorable James T. Giles similarly dismissed all claims against Defendants in their official capacities and an implied First Amendment claim asserted by L.H. See L.H. v. Evanko, No. Civ.A.00-5805, 2001 WL 605214 (E.D. Pa. May 6, 2001). These prior rulings constitute the law of this case and therefore shall apply with equal force to the claims in each of the consolidated cases.

troopers who perpetrated sexual misconduct.  On the other hand, if complaints of sexual misconduct

were properly investigated and duly adjudicated, the allegations of PSP trooper misconduct

referenced in the 47 BPR reports will have little, if any, relevance to the claims advanced by

Plaintiffs in this case.  In any event, it is unnecessary to make any determination on those issues at

this time.  Thus, in addition to granting Plaintiffs' Motion to Supplement, the Court will deny

without prejudice the Motion for Summary Judgment as to the claims against any and all PSP

Defendants whose liability may be predicated upon the information contained in the 47 BPR reports

that were filed in the Haber case.[6]  The June 17, 2003 redaction order entered in the Haber case

applies with equal force to all of the consolidated cases.[7]

## FACTUAL BACKGROUND[8]

### A.   EVANS' HIRING (March 1996)

In 1995, Evans applied to become a PSP trooper.  As part of the hiring process,

another trooper conducted an investigation into Evans' background.  David Seip Dep. at 21.  During

that process, the investigating trooper learned that Evans had a questionable past employment

history, including an allegation by a former supervisor that, as a city police officer, Evans made

racist remarks and was overly aggressive in the performance of his duties.  There were also

allegations that Evans had sexually harassed a female on campus at the Police Training Institute of

---

[6]  While it is true that Plaintiffs fail to articulate "excusable neglect" for their failure to submit the additional BPR reports in a timely manner along with their original, voluminous response to Defendants' Motions as required by Federal Rule of Civil Procedure 6(b), the decision to allow supplementation is based primarily upon the pendency of the recently filed Haber case.

[7]  In the event that additional case dispositive motions are filed, the parties need not re-file the BPR reports and other documents that were previously filed with the Court.  It will be sufficient for the parties to incorporate by reference the previously filed documents.

[8]  The facts presented in this section provide only an overview of the case.  The particular facts as they relate to the claims against each Defendant are set forth more fully infra.

the University of Illinois in 1989.  Finally, there was an unsubstantiated charge from an Allentown police officer that Evans was "f---ed up sexually."  Based upon what he learned about Evans, the investigating trooper believed that Evans should not be hired.  However, under procedures in place at the time, the investigator's opinions were not to be considered by the committee that made the hiring decisions.  Additionally, only allegations that could be substantiated were permitted to be included in the background report presented to the PSP Hiring Committee.[9]  In March 1996, Evans was hired and subsequently enrolled in the PSP Academy.  Upon graduation in October 1996, he was assigned to the Limerick Barracks in Montgomery County, Pennsylvania and thereafter to the Skippack Barracks when the Limerick Barracks relocated in 1997.[10]

**B.      EARLY ALLEGATIONS OF SEXUAL MISCONDUCT**

**1.       A.B. Incident (July 1997)**[11]

On July 10, 1997, only nine months after he graduated from the PSP Academy and while on probationary status, Trooper Evans responded to a burglary at the residence of H.B. and T.B. in Lower Frederick Township, Montgomery County, Pennsylvania.  Upon arriving at the scene, Evans spoke with H.B. and T.B., and also requested the opportunity to interview their 16-year-old

---

[9] The PSP guidelines for background investigations provided that investigators were not to express personal opinions either in the report or to those persons interviewed in the course of the investigation.  Cynthia Transue Dep. at 32-33.  The guidelines provided that the investigating trooper should attempt to verify or refute any derogatory information about the applicant.  Cadet Application Procedures at 19-20.  The trooper conducting the Evans background investigation was specifically advised that he should not include in the report any information that could not be substantiated.  Seip Dep. at 90-99; Transue Dep. at 55-57.  When the investigator attempted to follow a lead by interviewing a female whose name was provided to him by the Allentown police officer who alleged that Evans was "f---ed up sexually," she refused to cooperate.  Because the female refused to speak with the investigating trooper, he could not substantiate the charge and did not include it in the background investigation report.

[10] The Skippack and Limerick barracks are collectively referred to as "Troop K."

[11] In order to protect the privacy of alleged victims of sexual misconduct perpetrated by Evans, the Court has used their initials to designate those individuals throughout this Memorandum Opinion.  The Court, however, has used the actual names of those Plaintiffs who commenced civil action without using pseudonyms.

daughter, A.B., about the burglary.  While alone with A.B., Evans became sexually suggestive, asking her about her sexual history and requesting that she pose in a leopard skin bra and panties so that she could be a Polaroid locker girl.  The General Investigation Report, prepared in response to a complaint lodged by A.B.'s mother, contained allegations that Evans stuck his hands down his pants and rubbed his crotch as he asked A.B. to unzip her shirt.  See General Investigation Report, BPR 10212, dated Jan. 12, 1998.

Because there were no witnesses, Lieutenant Susan Lysek directed Corporal Robert Murray to ask A.B. to submit to a polygraph test.  Robert Murray Dep. at 65.  She agreed, and Trooper Lynn H. Eshleman administered the test on September 24, 1997.  Eshleman, who had administered more than 600 polygraphs over the course of ten years, concluded that A.B. was being truthful about the incident and that the test results showed no evidence of deception.  Lynn Eshleman Dep. at 106.  However, for quality control purposes the test results were later reviewed by a second polygraph expert, Corporal Douglas R. Brose, who found deception in A.B.'s negative responses.  Corporal Brose thereafter referred the results to Lieutenant Dennis Hunsicker, who also reported a finding of deception.[12]

Due to the inconsistent findings, Brose met with Eshleman to review the polygraphs.  During that meeting Brose criticized Eshleman's question formulations and urged him to modify his opinion that A.B. had been "truthful."  While Eshleman acknowledged that one might conclude that the test results were "inconclusive," he refused to change his original findings.  Moreover, Eshleman

---

[12] During their depositions, both Brose and Hunsicker testified that they believed that the A.B. polygraph test should have been invalidated and that their respective opinions that there was deception should not have been relied upon by Captain LaCrosse in adjudicating the A.B. complaint.  Douglas Brose Dep. at 474, 481-82; Dennis Hunsicker Dep. at 275-76.  However, the record reflects that LaCrosse did, in fact, rely upon Brose and Hunsicker's opinions of deception in finding that the charges against Evans were not founded.  Thomas LaCrosse Dep. at 516.

made clear to Brose that he did not see anything in the polygraphs that showed deception on A.B.'s part. Eshleman Dep. at 159-69. The polygraph results were then reviewed by a fourth polygraph expert, Raymond Solt, a former colleague and friend of Brose and Hunsicker, who allegedly reported to the internal affairs investigator in a telephone conversation that he, too, detected deception in A.B.'s responses. Murray Dep. at 163; Raymond Solt Dep. at 22-26.[13] As a result of the findings of Brose and Hunsicker, the PSP asked A.B. to submit to a second polygraph, a request that her parents refused.

Although A.B. passed her lie detector test initially, due to the reinterpretation of the test results, Captain Thomas J. LaCrosse, the adjudicator for the BPR, after conferring with Hunsicker, ultimately concluded that the charges against Evans were unfounded.[14] In a February 9, 1998 memorandum that disclosed his findings to Evans, LaCrosse stated that his determination was based, in part, upon Evans' "integrity, character, and professional demeanor," even though Evans had been a trooper for only a short period and was on probationary status at the time.

---

[13] At his deposition, Solt had no personal recollection of having performed a review of the A.B. polygraph charts. Solt Dep. at 20. Corporal Murray, who conducted the internal affairs investigation, testified that he received a telephone call from a person who identified himself as Solt and stated that the A.B. polygraph showed deceit. Murray Dep. at 163. Plaintiffs suggest that Hunsicker was responsible for having another individual call Murray and impersonate Solt.

[14] A.B. claimed that while Evans was making advances at her, he twice communicated with a dispatcher, falsely stating that he was on his way to an automobile accident. A PSP investigation suggested that based upon Evans' prompt response to his next radio call, A.B.'s assertion was false. However, a subsequent investigation by the Montgomery County District Attorney's Office after Evans was arrested revealed that Evans could have reported to the automobile accident in approximately five minutes, affording him sufficient time to harass A.B. and then report to the scene of the accident.

It should also be noted that Captain LaCrosse stated in his report adjudicating the A.B. incident that he had discussed the polygraph with Hunsicker while the investigation was pending. See General Investigation Report Memorandum, BPR-10212, dated Feb. 9, 1998. Because Hunsicker was Vice-President of the Pennsylvania State Troopers Association and had an interest in seeing that Evans, a member of the union, was not found guilty of any wrongdoing, there existed a conflict of interest. The LaCrosse report also inaccurately noted that Eshleman had changed his opinion concerning the polygraph results from truthful to inconclusive. See Eshleman Dep. at 162-71, 204; see also General Investigation Report at 1.

Personnel Investigation Memorandum.  At no point during the process was Evans required or even requested to submit to a polygraph test.

There is record evidence that Brose, Hunsicker, and LaCrosse may have manipulated an earlier polygraph test in 1996 to protect another PSP trooper under investigation for misconduct.  See LaCrosse Dep. at 706; Murray Dep. at 411-428; Hunsicker Dep. at 596-97.  Additionally, the score sheets prepared by Brose and Hunsicker in re-evaluating the A.B. polygraph test are missing, even though the PSP regulations require that records be retained for a period of ten years.  Brose Dep. at 159-60; Hunsicker Dep. at 23-25.

Further, a defense expert retained by the PSP Defendants in conjunction with the instant litigation concluded that it was inappropriate for Brose and Hunsicker to report that deception was indicated.  Instead, he said that the more reasonable conclusion would have been to have ruled that the polygraph was "inconclusive."  Gary Light Dep. at 37-38.  Finally, Deputy Chief Montgomery County Detective Edmund Justice, a certified polygraph examiner who reviewed the polygraph during the criminal investigation of Evans, concluded that A.B. passed and that Eshleman properly administered the test.  Edmund Justice Dep. at 59-61.

Evans subsequently pleaded guilty to a charge of corrupting the morals of A.B., a minor, and in his guilty plea colloquy specifically admitted that he in fact committed the acts as alleged by A.B. at the outset.  Guilty Plea and Sentencing Transcript (Oct. 3, 2000) at 29-30.

## 2.   Nude Photograph Incident (September 1998)

On September 17, 1998, after reports were made to his PSP supervisors, two Polaroid photographs of a nude female posing in front of a marked Pennsylvania State Police vehicle were seized from Trooper Evans' locker.  Fellow troopers reported that Evans claimed that the female was

a stripper or prostitute whom he had met during a traffic stop.

On November 10, 1998, Lieutenant David B. Kreiser documented the incident as a complaint of misconduct and thereafter a trooper was assigned to conduct an investigation.  In the General Investigation Report, the investigating trooper determined that Evans had displayed the nude photographs to numerous troopers, admittedly having improper contact with the female while on duty.  More troubling, however, was that fellow troopers interviewed during the investigation noted a pattern of sexual misconduct and improper behavior by Evans.  The report contained the following statements:

> Lieutenant Kreiser said he occasionally heard rumors, or matters would be brought to his attention concerning Trooper Evans.  Lieutenant Kreiser expressed his concern was that the rumors or matters brought to his attention were always sexual in nature.  Lieutenant Kreiser recalled one rumor where Trooper Evans was alleged to have masturbated in the parking lot of an establishment called the Trappe Tavern.  That rumor was looked into by the Commanding Officer of Troop K, and was found to have no substance to support it other than rumor status of unknown origin.

> Lieutenant Kreiser also recalled a matter that was brought to his attention in September 1998, by Sergeant Krupiewski.  Lieutenant Kreiser said there was an issue raised at a conference before Judge Paul W. Tressler, where the judge was notified that Trooper Evans allegedly made comments to a female passenger.  Lieutenant Kreiser said he does not remember what the exact comments were alleged to have been, but he seemed to recall the comments were sexual in nature.

> Lieutenant Kreiser advised this incident was looked into by Sergeant Krupiewski and found to be a misunderstanding.  Lieutenant Kreiser provided a copy of correspondence received by Sergeant Krupiewski from the attorney who raised this issue before Judge Paul W. Tressler.  (Refer to Attachment # 11.)  Lieutenant Kreiser advised after receipt of the letter this matter was considered closed.

> Lieutenant Kreiser also advised he was aware of the first IAD investigation conducted on Trooper Evans relative to Trooper Evans' allegedly making inappropriate comments to a female juvenile.  (Refer to IAD Investigation 10212.)  Lieutenant Kreiser said having the knowledge of each of these

incidents, in addition with this investigation, it's his opinion that Trooper Evans is building a track record of sexually related complaints.

\* \* \* \*

Corporal Comerer [related] an incident which he did have firsthand knowledge of. Corporal Comerer stated, "I was working on a rape investigation in Norristown in August 1998. We asked for a uniformed officer to assist. It was Evans. We were interviewing some Mexicans. It was hot in the place. We were there for around an hour and a half. A sergeant from Norristown came out to me and said, "You better get your uniformed guy out of there, that girl's boyfriend is ready to fight with him because he's getting too friendly with the guy's girlfriend."

Corporal Comerer said he told one of the other Pennsylvania State Police members on scene to handle the matter and he continued with his investigation of the rape. Corporal Comerer stated, "My priority was the rape, I had no time for a hormonal sex freak trying to pick up young girls." Corporal Comerer said he does not recall who it was who handled it, or what the outcome was. Corporal Comerer expressed his opinion that Trooper Evans' sexual appetite is going to cause the Pennsylvania State Police great embarrassment in the future.

\* \* \* \*

Trooper Altieri said he's heard all the rumors around [the] Skippack Station about Trooper Evans. Trooper Altieri stated, "Evans like to be the big shot. He brags about his escapades with women. Case in point, the photographs. He responds to incidents not to assist, but to talk to girls if there are any around. He tells so many different stories to people it's no wonder there are so many rumors floating around. He was that way in the Academy, big mouth, knew everything, he would correct the instructors, everyone was fed up with him. He's lucky he was assigned to a station where the Sergeant protects him, otherwise his behavior would have been addressed long ago."

Trooper Altieri wanted it noted that he has had no conflicts with Trooper Evans which would serve as a motive for him speaking so candidly about Trooper Evans. Trooper Altieri claimed he feels Trooper Evans needs help. Trooper Altieri stated, "I'm proud of this uniform I wear. I was perturbed and uncomfortable when he showed me those pictures. His sexual fixation is going to get someone hurt. He can't control himself when he's around a female. What's it going to take before someone puts a stop to this kind of stuff he continues to get involved in?"

-10-

Trooper Altieri, when asked why he did not report to a supervisor that Trooper Evans showed him the photographs of a nude female posing with a Pennsylvania State Police vehicle stated, "Not at first. As I said before, Evans is Sergeant Krupiewski's golden boy.[15] Nothing would have been done, and I would have gotten a lot of grief for coming forward. A little later I found out Evans showed Trooper Michael Chambers the same photographs. I talked to Chambers and we decided to approach Corporal Comerer with this problem. Comerer is fair and not afraid to do his job even if it meant taking on Sergeant Krupiewski.

\* \* \* \*

Trooper Chambers, when asked why he did not immediately report this incident to a supervisor, stated, "Three reasons. First, I have to work with this guy. Second, Krupiewski, he favors Evans, nothing would have been done. Evans told me he had got away with the incident where the young girl accused him of masturbating or something while he was alone in the house with her. He thinks he's invincible. Third, he likes to bullshit, so how do you know what's true and what's not? How do you prove it? I don't need the aggravation. I just stay away from him. He's trouble. It's unfortunate this job is going to wait until he hurts some girl."

General Investigation Report, Dec. 22, 1998, BPR 11012, at 7-11.[16]

After reviewing the internal affairs investigation report regarding the nude photograph, Captain LaCrosse sustained the allegations against Evans that, while on duty and in uniform, he took photographs of a nude woman in front of a state police vehicle. LaCrosse subsequently issued a Disciplinary Action Report leading to a three-day suspension, which Evans

---

[15] Plaintiffs point to evidence that Krupiewski favored Evans and that others, including Kreiser, were aware of this favoritism. Kreiser Dep. at 97; Gary Dance Dep. at 22. Plaintiffs note that both Evans and Krupiewski were Masons. In support of their conspiracy theory that PSP Defendants protected Evans, Plaintiffs call attention to the fact that Evanko, Conley, Coury, Werts, and Hunsicker were also members of the Grand Lodge of Free and Accepted Masons of Pennsylvania. See Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment at 162-63.

[16] Trooper Chambers subsequently denied making the statement that Evans told him that he got away with the incident where the girl accused him of masturbating. Michael Chambers Dep. at 37-38. However, the investigator who took the statement indicated that the statement was made and was properly attributed. Murray Dep. at 230-32.

served on May 3, 4 and 5, 1999.[17]

### C.   OTHER INSTANCES OF SEXUAL MISCONDUCT

Plaintiffs point to approximately 30 other incidents of sexual misconduct between 1996 and 1999, some of which various PSP supervisors had notice.  Nevertheless, Plaintiffs note that the supervisors failed to file complaints that would have initiated internal investigations for the alleged misconduct.

### 1.   Trappe Tavern Incident (April 1997)

In April 1997, troopers heard rumors that Evans, while off duty, masturbated in front of a woman, K.P., who was in his parked vehicle in the lot of the Trappe Tavern.  When the tavern closed at 2:00 a.m., Evans offered to give K.P. a ride to her vehicle, which was parked in the rear portion of the parking lot.  After she entered his Toyota SUV, Evans drove K.P. to the darkest part of the lot, reclined the seats in his vehicle, and displayed a pistol.  Evans then began kissing K.P. and caressing her breasts.  Thereafter, he exposed his penis and masturbated in front of her.  K.P. contends that she did not attempt to flee because she was frightened when she observed the firearm. K.P. Statement, Feb. 24, 2000, at 3-4.

At least one trooper testified that Captain LaCrosse was on notice of the Trappe Tavern incident as early as the spring of 1997.  Joseph Altieri Dep. at 67.[18]  Had an investigation

---

[17] LaCrosse also sustained a complaint against Sergeant Gary Fasy for failing to report Evans' misconduct. LaCrosse, who also adjudicated the A.B. complaint, testified that he did not correlate the statement that "Evans got away with the incident where the young girl accused him of masturbating or something while he was alone in the house with her" with the A.B. incident.  LaCrosse Dep. at 348-50.  Nevertheless, as a result of the allegations in the nude photograph investigation being the second sexual complaint against Evans, LaCrosse inquired as to whether it would be possible for him to re-open the A.B. investigation and change his determination from "unfounded" to "not sustained."  He was told by the BPR that the prior adjudication could not be modified.  Id. at 35153.

[18] LaCrosse contends that he first learned of the Trappe Tavern incident in September 1998.  LaCrosse Dep. at 196.

been conducted, it likely would have uncovered the allegations that Evans, while in the parking lot of a tavern, displayed a firearm and intimidated a woman who was in his personal vehicle while he masturbated.

### 2.      E.Z. Affair (November 1997)

In November 1997, Evans responded to a domestic abuse call at E.Z.'s home as a result of a dispute between E.Z. and her ex-husband.  After attending to the matter, Evans returned to E.Z.'s house in uniform later that evening.  During his return visit and while on duty, Evans and E.Z. engaged in sexual intercourse.  Evans and E.Z. had an ongoing sexual relationship for approximately one month.

The record contains evidence that Sergeant Fasy was aware of the improper sexual relationship with E.Z. as early as the fall of 1998.  See E.Z. Statement, May 4, 2000, at 2-3. Fasy failed to report Evans' misconduct in accordance with the PSP rules and regulations, and the matter was not investigated until 2000.

### 3.      Sexual Assault of 14-Year-Old Ashley Haber (April 1998)

On April 16, 1998, while transporting a 14-year-old runaway to a Montgomery County shelter, Evans asked the minor questions about intimate parts of her body, rubbed her genital area, and grabbed her breasts for the purposes of sexual gratification.[19]  Guilty Plea/Sentencing Transcript at 30.  The runaway, Ashley Haber, reported the incident to her mother.  Ashley Haber Statement, dated Jan. 10, 2000, at 5.  Thereafter, Ashley Haber's mother contacted Sergeant Fasy and questioned him about Evans' reputation.  During that telephone conversation, she advised Fasy

---

[19]  On May 30, 2003, Ashley Haber commenced action against Evans and various PSP Defendants.  That case is docketed at No. 03-CV-3376.

that she believed that something had "happened" and that Evans had made a pass at her daughter. General Investigation Report, dated June 1, 2001 at 4; see also Gary Fasy Dep. at 78-91. Fasy responded that Evans seemed "okay" and that he "does an alright job." Id. at 81. Notwithstanding the telephone call to Fasy, no complaint was filed or investigation conducted as a result of the incident.

In October of 2000, Evans pleaded guilty to indecent assault as a result of his inappropriate and illegal contact with the minor.

### 4.     R.S. Incident (September 1998)

In September 1998, Sergeant Krupiewski received a telephone call from a Montgomery County assistant district attorney who advised that Evans engaged in inappropriate sexual misconduct towards R.S. during a January 1998 DUI arrest. Kevin Krupiewski Dep. at 248-49, 281-83. During the arrest, Evans made various sexually suggestive remarks to the female, including that he would like to sniff the seats in her automobile, that he would like to watch her urinate, and that he would like to buy a videotape of R.S. and her husband having sexual intercourse. Statement of R.S. dated Jan. 6, 2000.

Although Krupiewski allegedly received only a general complaint of misconduct at the time, he failed to document the complaint, which would have led to an internal investigation. Krupiewski Dep. at 262-70. Instead, Krupiewski reported the incident to Lieutenant David Kreiser (the commanding officer), who said that he would handle the matter. Id. at 316-28. Kreiser also failed to properly document the complaint. David Kreiser Dep. at 136-220.[20] As a result of the

---

[20] Krupiewski contends that in early September 1998 he informed Kreiser that there were allegations concerning Evans during a DUI stop which related to a "video and sex." Krupiewski Dep. at 312-29. Kreiser, however, denies having knowledge of the incident until Krupiewski provided him with a letter dated September 4, 1998 in which the DUI passenger withdrew the complaint against Evans. Kreiser believes he received the letter in

inaction of Krupiewski and Kreiser, no internal affairs investigation was conducted.

**D.**     **PSP REGULATIONS REGARDING ALLEGATIONS OF MISCONDUCT**

The PSP Department Directives regarding complaints of misconduct of members

provide, in relevant part, as follows:

> G.   Personnel Receiving Complaints:   Personnel receiving
>     complaints shall:
>
>     1.   Receive complaints against personnel in a courteous
>         manner.
>
>     2.   Document complaints when they are received.
>         Complainants shall not be advised to call back later to
>         speak with a supervisor or instructed to contact the
>         Bureau of Professional Responsibility directly.   This
>         does not prohibit supervisors from recontacting a
>         complainant to clarify information.
>
>      NOTE: Personnel desiring to initiate a complaint shall be
>     responsible for completing their own Use of Force or
>     Complaint Reception and Processing Worksheet.
>
>     3.   Ensure that confidentiality of all complaints is
>         maintained.
>
>     4.   Process all complaints in accordance with the provisions
>         of this regulation.

Pennsylvania State Police Administration Regulation 4-25, § 25.08(G) (Sept. 2, 1993).

The Department Directives also provide that "[e]very complaint, whether anonymous,

verbal or written, received by personnel shall be recorded on the Use of Force or Complaint

Reception and Processing Worksheet, and processed as described in Appendage I."   Id. §

25.10(B)(1).  Moreover, the regulations emphasize that complaints of sexual harassment provide a

---

November 1998.

high potential for liability and accordingly should be investigated immediately. Id. § 25.10(D)(1).

The directives broadly define the term *complaint* to include "any allegation of misconduct" made against PSP personnel. Id. § 25.04(F). *Misconduct* is defined as "[a]ny violation of the Pennsylvania State Police Code of Conduct or any other conduct which could reasonably be expected to destroy public respect and confidence in the Pennsylvania State Police." Id. § 25.04(K). Under the regulations, misconduct includes both on-duty and off-duty conduct which is demeaning to the public's perception of the department. See id. § 25.05(D)-(E).

### E.   PLAINTIFFS' CLAIMS

Of the five cases consolidated under the above-captioned number, two have settled. The Court sets forth below a summary of the claims of the three remaining plaintiffs in this case.

### 1.   Plaintiff Linda Weller's Claims (January 1999)

On January 31, 1999, at approximately 8:20 p.m., after watching the Super Bowl at a bar, Linda Weller and a male companion left the establishment. Weller was riding as a passenger in her own vehicle. As Weller and her companion were traveling on a public roadway, they were pursued by Evans as a result of an alleged traffic violation. Linda Weller Dep. at 105. The driver of the vehicle drove off the road and into a cornfield and thereafter fled from the scene. When Evans arrived at the vehicle, he observed Weller in the passenger seat. He violently removed her from the car, handcuffed her, frisked her, and arrested her. Id. at 107-10, 118. Evans then took Weller to the barracks, where he frisked her a second time, squeezing her breasts purportedly to make sure there were no concealed weapons. Id. at 118-22. After Weller refused to sign a statement that contained numerous inaccuracies, she was released from police custody, frisked a third time by Evans, and then transported to her home by Trooper Evans. Id. at 143-44.

On the way home, Trooper Evans made repeated inappropriate remarks about Weller's breasts. Id. at 145. Evans pulled his patrol car off the road and parked in a field near Old Skippack Road. There he exposed his genitals, grabbed Weller, and placed her hand on his bare penis. Id. at 146-47. Weller, who was crying, could not open the door of the patrol car and demanded to be taken home. Upon arriving at her residence, Evans forced his way into the sunroom of Weller's home, pushed her onto a table, forcibly removed her pants, and despite repeated requests to stop, penetrated her vagina with his tongue. Id. at 149-51. Evans left the sunroom briefly to retrieve Weller's keys, and then forced his way into Weller's home. Once inside he grabbed her naked buttock and tried kissing her, at which time her thirteen year-old son came into the room. Evans thereafter warned Weller and her son that they would regret it if they told anybody about the incident. Id. at 158-59.

Evans subsequently pleaded guilty to official oppression as a result of this conduct with Weller. See Guilty Plea and Sentencing Transcript (Oct. 3, 2000) at 30.

## 2.   Plaintiff Denise Maslow's Claims (July 1999)

On July 18, 1999, Evans responded to a call in which Denise Maslow attempted to commit suicide by overdosing on drugs. Denise Maslow Dep. at 24. Two days later, Trooper Evans visited Maslow, who was pregnant, at the hospital where she had been admitted. While they were alone in the hospital room, Maslow asked for help in locating her car, which had been stolen. Evans responded that the car was out of his jurisdiction, so if she wanted his assistance, she would have to do him a favor. Id. at 37. Evans had Maslow remove her shirt, after which he masturbated while touching her breasts. Id. at 39-43. After Maslow delivered her baby and was discharged from the hospital, a similar incident occurred when Evans visited her at her home. Defendants concede there

was non-consensual sexual contact between Evans and Maslow at this time.  See Defendants'

Motion at 24.  Evans told Maslow not to "say anything" about the incident, or he would have both

the home and her newborn child taken away.  Maslow Dep. at 50-54.

As a result of his conduct with Maslow, Evans pleaded guilty to indecent assault and

official oppression.  See Guilty Plea/Sentencing Transcript (Oct. 2, 2000) at 32-33.

### 3.      Plaintiff Nancy Doe's Claims (August 1999)

Evans responded to a domestic disturbance call in September 1998.  He went to the

hospital to interview Nancy Doe, the complainant, about the incident.  He requested that upon her

discharge from the hospital she go to the barracks so that he could photograph her injuries.  Evans

gained Doe's trust, assuring her that he would not let anybody hurt her.  Nancy Doe Dep. at 37.

Evans subsequently arrested Doe's boyfriend.

Thereafter, Doe and Evans telephoned one another on a regular basis.  Evans met Doe

at a related court proceeding on August 17, 1999, and made several sexually inappropriate

comments to her.  Id. at 124-25.  Following the hearing, Evans instructed Doe to follow him in her

car to a secluded area.  Id. at 57-58.  Once there, Evans asked Doe to get out of the car in order to

give her some legal paperwork, at which time he grabbed her sweater and chest, held on, exposed

his penis, began masturbating, and ultimately ejaculated.  Id. at 59.  Evans then forced Doe into the

back seat of her car and began kissing her lips and neck, but Doe successfully struggled to get away,

and drove off with the rear car door still ajar.  A similar incident occurred the following day, and

Doe again rejected Evans' advances.  Id. at 66.

As a result of his contact with Doe, Evans pleaded guilty to official oppression.  See

Guilty Plea and Sentencing Transcript (Oct. 3, 2000) at 31-32.

## SUMMARY JUDGMENT STANDARD

The underlying purpose of summary judgment is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense. Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976). Under Fed. R. Civ. P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Celotex Corp. v. Catreet, 477 U.S. 317, 322-32 (1986). In deciding a motion for summary judgment, all facts must be viewed and all reasonable inferences must be drawn in favor of the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## DISCUSSION

Plaintiffs' claims arise under 42 U.S.C. § 1983, which provides a cause of action for any person deprived of rights secured by the United States Constitution or laws of the United States by a person acting under color of state law.[21] Plaintiffs allege that Evans' numerous acts of sexual misconduct, and his PSP supervisors' deliberate indifference to the danger presented by Evans to women in the community, deprived them of their substantive due process rights.

The central question in the case is whether the PSP supervisors, as well as Evans, may be liable for Evans' sexual assaults under § 1983. As noted supra, Evans has not filed a

---

[21] Title 42 U.S.C. § 1983 provides, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

dispositive motion.  The PSP Defendants do not rush to his defense by arguing that Plaintiffs lack sufficient evidence to demonstrate Evans' liability arising from his conduct toward Plaintiffs. However, in the course of asserting qualified immunity, the PSP Defendants do contend that Evans' conduct did not violate clearly established law.  The Court disposes of Defendants' argument in its discussion of qualified immunity, infra, and now turns to a discussion of whether Plaintiffs have adduced sufficient evidence to withstand Defendants' Motions for Summary Judgment.

It is well settled that Evans' supervisors cannot be held liable to Plaintiffs for Evans' actions based upon a *respondeat superior* or vicarious liability theory.  See Monell v. Dept. of Soc. Servs., 436 U.S. 658 (1978); C.H. v. Oliva, 226 F.3d 198, 202 (3d Cir. 2000) (en banc).  In order for supervisory personnel to be held liable for civil rights violations caused by a subordinate police officer, a plaintiff must show "an affirmative link between the occurrence of the various incidents of police misconduct and the adoption of any plan or policy, express or otherwise, showing their authorization or approval of such misconduct."  Rizzo v. Goode, 423 U.S. 362, 371 (1976).  The standard for personal liability under § 1983 is the same as that for municipal liability.  Carter v. City of Philadelphia, 181 F.3d 339, 356 (3d Cir. 1999).  Plaintiffs allege that Defendants' deliberate indifference led to Evans' alleged constitutional violations.  See Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989).

To establish the PSP Defendants' liability, Plaintiffs point to their knowledge of prior incidents of sexual misconduct perpetrated by Evans while he was a state trooper.  In attempting to establish a constitutional violation, Plaintiffs point to evidence that the supervision of Evans was grossly inadequate and that the PSP Defendants were aware of a pattern of sexual misconduct. Plaintiffs assert that Evans' conduct toward them was a natural and foreseeable consequence of the

failure to investigate or address Evans' pervasive predatory propensities and that said inaction constituted tacit authorization on the part of these officials. They also contend that the PSP Defendants maintained inadequate policies and procedures that failed to prevent the harm inflicted upon Plaintiffs. Finally, Plaintiffs allege a conspiracy among various PSP Defendants to conceal Evans' conduct and deprive women in the community of their constitutional rights. In sum, Plaintiffs argue that Defendants may be held liable under four separate theories: (A) failure to adequately screen Evans' application for employment; (B) failure to maintain adequate policies and procedures governing sexual misconduct; (C) failure to supervise Evans; and (D) civil conspiracy.[22] The Court will address each theory in turn, and if need be, turn to the issue of qualified immunity.

### A.    FAILURE TO SCREEN IN HIRING

Plaintiffs contend that the PSP Defendants improperly screened Evans' background when he was hired. Plaintiffs allege that the employment background investigation should have uncovered Evans' negative history and, additionally, should have precluded the PSP from accepting his employment application.

In order to establish a failure to screen case, a plaintiff must show that if defendants had adequately screened Evans, they "should have concluded" that the subsequent sexual improprieties would have been "a plainly obvious consequence of the hiring decision." Bd. of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 411 (1997) ( holding that "only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude

---

[22] Plaintiffs Weller and Maslow also assert Pennsylvania common law claims against all Defendants. The Defendants move for summary judgment as to these claims on the basis of sovereign immunity. Plaintiffs make no response to this argument. The Court agrees that these state law claims are barred by the doctrine of sovereign immunity. Therefore, summary judgment is appropriate as to these claims. See 1 Pa. Cons. Stat. Ann. § 2310; 42 Pa. Cons. Stat. Ann. § 8522; Altieri v. Pennsylvania State Police, No. Civ.A.98-5495, 2000 WL 427272, at *5 (E.D. Pa. Apr. 19, 2000) (dismissing claims against state police officers on basis of sovereign immunity).

that the plainly obvious consequence of the decision to hire the applicant would be a deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute deliberate indifference").

The "negligent failure to check every reference or past employment record does not evidence indifference. . . ." <u>Andrews v. Fowler</u>, 98 F.3d 1069, 1077 (8th Cir. 1997) (citing <u>Stokes v. Bullins</u>, 844 F.2d 269, 273 (5th Cir. 1988)).   While the background investigation revealed unsubstantiated negative allegations about Evans' sexual history, Plaintiffs have failed to show that Evans' subsequent sexual misconduct perpetrated upon Maslow, Weller and Doe was "a plainly obvious consequence." <u>Bryan County</u>, 520 U.S. at 411.  Even if the hiring process used for Evans' application may not have fully conformed to the PSP's official policy, a failure in one instance does not render the hiring policies unconstitutional.  <u>See Andrews</u>, 98 F.3d at 1077-78 (finding no liability under § 1983 even though hiring procedures in fact did not fully conform to hiring policies). Even if the PSP had allowed trained, experienced screeners to note their opinions and observations, a practice that the Court believes to be minimally required, it would not necessarily have produced flawless hiring results.  Therefore, this Court holds as a matter of law that, while clearly deficient, the investigating and hiring policies and procedures in place at the time were not so wanting that they support a finding of deliberate indifference as to the constitutional rights of Plaintiffs. Accordingly, Plaintiffs have failed to make out a constitutional violation, and the PSP Defendants are entitled to summary judgment on Plaintiffs' failure to screen in hiring claim.

### B.   INADEQUATE POLICIES AND PROCEDURES

When officials with responsibility to prevent harm fail to establish or execute appropriate procedures for preventing serious malfunctions in the administration of justice, such

failure supports a claim under § 1983.  Colburn v. Upper Darby Township, 838 F.2d 663, 671 (3d Cir. 1988).  In addition to claims grounded in a failure to supervise Evans in particular, see infra, Plaintiffs advance such claims against certain Defendants in this case who occupy the "upper echelons" of the PSP.  As noted supra at pages 3-4, the Court will allow supplementation of the record with respect to the claims against Defendants Evanko, Coury, and Conley.  In the event that Plaintiffs can use the BPR reports and other records to establish that these Defendants adopted or maintained policies and practices of condoning sexually improper conduct or that they failed to discipline PSP members engaged in sexual misconduct, summary judgment will not be appropriate.

While the evidence in the present record does not support Plaintiffs' contention that a widespread and pervasive practice of minimal punishment to male troopers for sexual misconduct existed, the additional documentation may show that Evanko, Coury, and/or Conley ignored complaints regarding sexual abuse of women.  Because Plaintiffs will be permitted to submit additional evidence that these Defendants participated, encouraged, authorized or acquiesced in the offending conduct, the Court denies without prejudice the Motion for Summary Judgment as to these defendants.

## C.    FAILURE TO SUPERVISE

Liability under § 1983 will lie against supervisors whose conduct amounts to "deliberate indifference" to the rights of persons with whom their subordinates will come into contact.  See, e.g., Carter v. City of Philadelphia, 181 F.3d 339, 357 (3d Cir. 1999).  However, supervisors "must have personal involvement in the alleged wrongs" of their subordinates. Robinson v. City of Pittsburgh, 120 F.3d 1286, 1294 (3d Cir. 1997) (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)); Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir.

1990) ("there must be some affirmative conduct by the supervisor that played a role" in the constitutional violation).  A plaintiff can demonstrate a supervisor's "personal involvement" by showing that he (1) participated in violating the plaintiff's rights; (2) directed others to violate the plaintiff's rights; or (3) had knowledge of and acquiesced in his subordinates' violations.  Robinson, 120 F.3d at 1293; Baker v. Monroe Township, 50 F.3d 1186, 1190-91 (3d Cir. 1995).  Here, Plaintiffs press their supervisory liability claims under the third theory.

Elaborating on this third method of proving supervisory liability, the Third Circuit has noted that "[w]here a supervisor with authority over a subordinate knows that the subordinate is violating someone's rights but fails to act to stop the subordinate from doing so, the factfinder may usually infer that the supervisor 'acquiesced' in (i.e. tacitly assented to or accepted) the subordinate's conduct."  Robinson, 120 F.3d at 1294.  As noted, the plaintiff must demonstrate that this failure on the part of the supervisor amounts to "deliberate indifference" to the rights of persons with whom the subordinate will come into contact.  Carter, 181 F.3d at 357 (citing City of Canton v. Harris, 489 U.S. 378, 388 (1989)); Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989) (to be held liable for subordinate's constitutional violations, a supervisor must have "exhibited deliberate indifference to the plight of the person deprived").  "[T]he plaintiff must identify specific acts or omissions of the supervisor that evidence deliberate indifference and persuade the court that there is a "relationship between the 'identified deficiency' and the 'ultimate injury.'"  Brown v. Muhlenberg Township, 269 F.3d 205, 216 (3d Cir. 2001) (quoting Sample, 885 F.2d at 1118).  Put another way, a plaintiff can establish this causal relationship by demonstrating that a supervisor's inadequate supervision - - which includes "monitoring adherence to performance standards" and "responding to unacceptable performance . . . through individual discipline" - - is the "moving

-24-

force" behind the subordinate's constitutional tort. <u>Sample</u>, 885 F.2d at 1117-18 (quoting <u>City of Canton</u>, 489 U.S. at 389)). Such a showing satisfies § 1983's causation requirement. <u>See</u> <u>Berg v. County of Allegheny</u>, 219 F.3d 261, 276 (3d Cir. 2000) (causation can be established by demonstrating that action was taken with deliberate indifference to its "known or obvious consequences"); <u>Harris v. City of Pagedale</u>, 821 F.2d 499, 508 (8th Cir. 1987) ("Where it becomes clear that a police force needs close and continuing supervision because of a known pattern of misconduct, and the municipality fails to provide such supervision, 'the inevitable result' is a continuation of the misconduct.") (citation omitted).

Here, Plaintiffs proceed on a theory that Defendants tolerated Evans' past and ongoing misbehavior, and that such tolerance amounts to "deliberate indifference." The Third Circuit has enunciated the following test in this context:

> [A] plaintiff asserting a failure to supervise claim must not only identify a specific supervisory practice that the defendant has failed to employ, he or she must also allege both (1) contemporaneous knowledge of the offending incident *or knowledge of a prior pattern of similar incidents*, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval.

<u>C.H. v. Oliva</u>, 226 F.3d 198, 202 (3d Cir. 2000) (en banc) (emphasis added) (internal quotes and citations omitted); <u>Montgomery v. DeSimone</u>, 159 F.3d 120, 127 (3d Cir. 1998) (same). The Third Circuit has held that this standard requires "actual knowledge and acquiescence," which "can be inferred from circumstances other than actual sight." <u>Baker</u>, 50 F.3d at 1194.

Although this formulation requires knowledge of a "prior pattern of similar incidents," other Third Circuit precedent suggests that prior acts of misconduct amounting to less than a "pattern" may suffice. "[T]here are situations in which the risk of constitutionally cognizable harm is so great and so obvious that the risk and the failure of the supervisory officials to respond

will alone support findings of the existence of an unreasonable risk, of knowledge of that unreasonable risk, and of indifference to it." Beers-Capitol v. Whetzel, 256 F.3d 120, 134 (3d Cir. 2001); see also Berg, 219 F.3d at 276 (plaintiff may establish supervisory liability "without showing a pattern of constitutional violations" by demonstrating that supervisor's actions reflected deliberate indifference to "obvious" or "highly predictable" consequences) (emphasis added) (quoting Bryan County, 520 U.S. at 407); Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 725 (3d Cir. 1989) ("if the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, 'the policymakers . . . can reasonably be said to have been deliberately indifferent to the need.'") (quoting City of Canton, 489 U.S. at 390)); Kis v. County of Schuylkill, 866 F. Supp. 1462, 1477 (E.D. Pa. 1994). However, consistent with the Supreme Court's admonition that this showing can be made "in a narrow range of circumstances," Bryan County, 520 U.S. at 409, the Third Circuit has recognized that proving supervisory liability through evidence of a prior pattern of misconduct is easier than demonstrating deliberate indifference with evidence of "so great and so obvious" a risk. Beers-Capitol, 256 F.3d at 134 (demonstrating a "pattern" of prior injuries is "perhaps the easiest way").

　　　　　Finally, the Third Circuit has noted that the "deliberate indifference" standard "is a high one . . . requiring actual knowledge or awareness on the part of the defendant" supervisor. Id. at 137. That is, a court must look to what the supervisor "actually knew rather than to what a reasonable official in his or her position should have known." Id. at 131; see also Johnson v. Elk Lake Sch. Dist., 283 F.3d 138, 144 n.1 (3d Cir. 2002). Actual knowledge may be proven by circumstantial evidence if the risk presented was so obvious that an official must have known about it. Beers-Capitol, 256 F.3d at 133. Such evidence is not conclusive, however; officials may still

-26-

prove that they were unaware of even an obvious risk.  Cf. Farmer v. Brennan, 511 U.S. 825, 844 (1994).

Plaintiffs make claims against the PSP Defendants for an alleged policy or custom of deliberate indifference to the known risk of Evans' sexual predatory conduct against female citizens, and tacit approval of his unlawful conduct.  They contend that despite having knowledge that Evans was making unlawful sexual advances upon one or more female citizens, the PSP Defendants took inadequate (or no) measures in response, thereby tolerating the misconduct.  See Oliva, 226 F.3d at 202 (plaintiff must "identify a specific supervisory practice that the defendant has failed to employ").  Additionally, they assert that the risk of harm was so great and so obvious that the failure of supervisory officials to respond demonstrates that they had knowledge of the risk and acted with indifference to it.

In order to defeat the PSP Defendants' Motions for Summary Judgment, Plaintiffs must establish that *each* Defendant was deliberately indifferent.  As noted above, each Defendant's liability turns on the sum of his knowledge at the time Plaintiffs' claims arose, and whether his conduct in light of such knowledge amounted to deliberate indifference.

### 1.   Major Conley

Major Conley served as Director of the BPR and was primarily responsible for internal affairs investigations of trooper misconduct.  Notwithstanding that it was one of his duties to review all general investigation reports, Conley admitted that he never reviewed the nude photograph report.  Hawthorne Conley Dep. at 118-20.  Conley also acknowledged that if he had read the nude photograph report, he would have been concerned about Evans' future behavior.  Id. at l6l-62.  Plaintiffs argue that the failure to review the General Investigation Report demonstrates

-27-

Conley's deliberate indifference and that his inaction allowed Evans to continue to victimize women without detection.

First and foremost, the record reflects that Major Conley did not review the nude photograph report because he was on vacation when it was submitted. Id. at 121-23. As a result, the report was actually reviewed by acting director of the BPR, Darryl Ober. Id. at 121-23. Moreover, there is no evidence that Conley had actual or constructive knowledge of Evans' sexual proclivities. Nevertheless, because the Court will allow supplementation of the record, and because Conley neglected his duty to review the BPR reports, the Court will deny without prejudice his Motion for Summary Judgment.

### 2.   Major Werts

Major Werts was the Area VI Commander in charge of Troop K. The record reflects that Major Werts reviewed the January 12, 1998 subject investigative report regarding the A.B. incident, so by February 1998 he was aware of A.B.'s allegations and of Captain LaCrosse's determination that A.B.'s allegations were unfounded. Thomas Robert Dep. at 91-100. Werts admitted that the PSP did not closely monitor Evans after the A.B. investigation, but he emphasized that there was little justification for doing so at the time in light of the finding that the charges were unfounded. Id. at 138-42.

By February 1999, Werts reviewed the report regarding the nude photograph incident. Werts Dep. at 150-51. Therefore, he knew that Evans had displayed photographs of a naked prostitute or stripper posing with a PSP vehicle, and that Evans had told at least one trooper he had sex with the woman in a PSP vehicle. In addition, having reviewed the investigation report, Werts would have been aware of multiple circulating rumors of Evans' sexual misconduct, including that:

(1) Kreiser was concerned that such rumors "were always sexual in nature," and that Evans was "building a track record of sexually related complaints"; (2) Evans masturbated in the parking lot of the Trappe Tavern, although the incident was described therein as a "rumor of unknown origin" with "no substance to support it"; (3) Evans made inappropriate comments of a sexual nature during a DUI stop; (4) Evans' flirtation with a female during a rape investigation caused concern that the woman's boyfriend would become violent; (5) a police corporal described Evans as a "hormonal sex freak trying to pick up young girls" and stated that "Trooper Evans' sexual appetite is going to cause the Pennsylvania State Police great embarrassment in the future"; (6) Evans liked to brag about his escapades with women; (7) Evans responded to incidents "not to assist, but to talk to girls if there are any around"; (8) Krupiewski favored Evans, who was considered by some to be Krupiewski's "golden boy," and that this protective relationship discouraged some troopers from reporting Evans' misconduct; (9) one unbiased trooper opined that Evans "needs help," that Evans "can't control himself when he's around a female," and that Evans' "sexual fixation is going to get someone hurt"; and (10) Evans told another trooper that he "got away with" the incident where the young girl accused him of misconduct.[23]   General Investigation Report, Dec. 22, 1998, BPR 11012, at 7-11. Werts did not participate in the decision regarding what kind of discipline to impose on Evans, but he "had some concerns" as to whether Evans should continue serving as a state trooper.  Werts Dep. at 154-55, 189-90.

Viewing the evidence in the light most favorable to Plaintiffs, there is circumstantial evidence that Werts failed to respond appropriately in the face of a "risk of constitutionally

---

[23] As noted supra at footnote 16, the trooper who initially reported this statement recanted when he testified in this case.  However, the Court must accept Plaintiffs' version of events on this motion for summary judgment.

cognizable harm" that was "so great and so obvious" that his failure to respond alone would support a claim of deliberate indifference. Beers-Capitol, 256 F.3d at 134. Although Werts would have known from his review of the investigative report that the PSP deemed A.B.'s allegations to be unfounded, Werts also knew that Evans was claiming he had "gotten away" with the misconduct alleged by A.B. Knowledge of such conflicting information should alone compel a supervisor to act; even the mere suggestion that a state trooper had committed misconduct of a sexual nature involving a young girl presents a plainly obvious and highly consequential risk of constitutional harm. This is especially so because Werts was also aware that other officers had opined that Evans often sought out young women while on duty and that Evans' conduct was likely to lead to further injuries. Significantly, after reading the report, Werts himself "had some concerns" about permitting Evans to serve as a state trooper, but did nothing to act on these concerns. In addition, the repeated suggestion that Krupiewski was directly or indirectly discouraging complaints against Evans gives rise to the inference that there may have been other incidents that went unreported.

Taken alongside the sheer volume of scandalous material presented in the nude photograph incident report, a reasonable jury could conclude that Werts failure to respond in an appropriate manner constituted deliberate indifference to Evans' misconduct and the obvious risk he posed to women in the community, including Plaintiffs. See C.M. v. Southeast Delco Sch. Dist., 828 F. Supp. 1179, 1185 (E.D. Pa. 1993) (holding jury could find school administrators acted with deliberate indifference as to teacher's physical, verbal and sexual abuse of students when other teachers made multiple complaints to administrators, the complaints conveyed message that teacher was a "depraved and dangerous man," and administrators knew of students' reluctance to report abuse); cf. Berg, 219 F.3d at 275 (deliberate indifference "implies a failure to take *reasonably*

*available measures* to reduce or eliminate" a serious risk of harm) (emphasis added).

As Area 6 commander, Werts' inaction communicated to his subordinates, including Evans, that he tacitly approved of such misconduct, or at the very least that sexually predatory officers do not present cause for alarm in Area 6.  Moreover, there is circumstantial evidence from which a jury could conclude that Evans' misconduct was the subject of widespread discussion among fellow troopers.  Thus, when supervisors failed to take action against such a malignant actor, it communicated condonation of such misconduct.  See Oliva, 226 F.3d at 202 (Plaintiffs must show "circumstances under which the supervisor's inaction could be found to have communicated a message of approval"); cf. Andrews, 895 F.2d at 1479 (supervisor's failure to investigate abuse against plaintiff "implicitly encouraged squad members to continue in their abuse").  As the Eighth Circuit noted, the causation requirement is satisfied in circumstances such as these because if a supervisor fails to act when action is obviously needed, "the inevitable result" is continued misconduct.  Harris, 821 F.2d at 508 (quoting Herrera v. Valentine, 653 F.2d 1220, 1225 (8th Cir. 1981), abrogated on other grounds by Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 304-05 nn.5-6 (1986) and City of Canton, 489 U.S. at 388 n.7; see also Bielevicz v. Dubinon, 915 F.2d 845, 851 (3d Cir. 1990) ("Indeed, it is logical to assume that continued official tolerance of repeated misconduct facilitates similar unlawful actions in the future.").  Thus, viewing the evidence in the light most favorable to Plaintiffs, Werts' failure to respond could constitute deliberate indifference. Plaintiffs have raised a genuine issue of material fact as to Werts' liability, and therefore his Motion for Summary Judgment is denied.

### 3.    Sergeant Krupiewski

Sergeant Kevin T. Krupiewski was the patrol sergeant at the Limerick/Skippack

Barracks and supervised Evans in Troop K.  There is evidence in the record that some troopers believed Krupiewski favored Evans, and that Krupiewski did or would take action to protect Evans. See, e.g., General Investigation Report, Dec. 22, 1998, BPR 11012, at 10-11.

In addition to being aware of the 1997 A.B. investigation and the 1998 nude photograph investigation, Sgt. Krupiewski was aware of allegations that Evans had exposed himself at the Trappe Tavern.  Krupiewski Dep. at 214-18.  Moreover, in September 1998, an assistant district attorney advised Krupiewski of an incident in which Evans made improper sexual remarks to R.S. during a January 1998 DUI stop.  Id. at 250-55.  Krupiewski was not aware of the details of R.S.'s allegations, but knew the allegations concerned videotaping and sex.  Id. at 292, 313. Krupiewski failed to question Evans about this incident, to properly document the incident, or to report it to internal affairs.  Rather, he merely informed Lieutenant Kreiser, who in turn also failed to document the incident.  Id. at 269-78, 298-305, 318-28.  Plaintiffs have produced evidence that this failure violated PSP procedures and policies regarding documentation of complaints, which require immediate documentation of complaints, and which define "complaint" broadly.  As a consequence of Krupiewski's violation of PSP policy, the PSP never investigated the R.S. incident. Krupiewski admitted that an investigation should have been conducted.  Had an investigation been conducted, Krupiewski would have learned from R.S. that during the January 1998 DUI stop, Evans made numerous sexually suggestive remarks to R.S.; requested to purchase a videotape of her having sex with her husband; and suggested he might visit R.S.'s house and surreptitiously watch her and her husband having sex.  Id. at 317-19, 339-40; 1/6/00 Statement of R.S. at MC000215-218.

In sum, Krupiewski was aware in early 1999 that Evans had been formally investigated for two separate instances of sexual misconduct.  In addition, Krupiewski was aware

that Evans had exposed himself in the parking lot of the Trappe Tavern, and that Evans allegedly made inappropriate sexual comments during a DUI stop.

The Court is satisfied that this quantum of evidence, and Krupiewski's failure to respond appropriately when given the opportunity, is a sufficient basis from which a reasonable jury could conclude that Krupiewski was deliberately indifferent to the risk posed by Evans to women in the community.  Even before learning of the R.S. incident, Krupiewski knew about numerous rumors and allegations concerning outrageous sexually-charged conduct by Evans.  Cf. Parrish v. Luckie, 963 F.2d 201, 203-05 (8th Cir. 1992) (affirming jury verdict against city where plaintiff presented "overwhelming evidence" that chief of police failed to respond appropriately when he learned subordinate officer was under investigation for child abuse, had parked in an alley with a female prisoner in an unlit patrol car, had repeatedly requested sexual favors from a store clerk and other women, and had used excessive force on other occasions).  When the assistant district attorney informed Krupiewski of the impropriety during the R.S. DUI stop, which was also sexual in nature, he apparently afforded it some credence because he reported it to Kreiser.  Yet, he failed to prepare a complaint as required by PSP policy and, as other Defendants have done with similar omissions, thereby thwarted the mechanism in place designed to prevent the kind of harm alleged by Plaintiffs in this case.  Cf. Bielevicz, 915 F.2d at 851 ("it is logical to assume that continued official tolerance of repeated misconduct facilitates similar unlawful actions in the future").  Krupiewski's alleged protective stance toward Evans also lends support to the notion that he had personal reasons for acting contrary to his obligations or that he allowed his favoritism of Evans to stand in the way of his duties.  Taken in this light, a reasonable jury could conclude that Krupiewski's failure to act, despite the knowledge in his possession, constituted deliberate indifference to Evans' propensity for

sexual misconduct.  Cf. Beck v. City of Pittsburgh, 89 F.3d 966, 973 (3d Cir. 1996) (holding

plaintiffs produced sufficient evidence that chief of police and police department knew or should

have known of officer's "propensity for violence when making arrests" where plaintiffs showed

supervisors knew of four prior unsustained complaints of similar nature in five year period against

subordinate officer).  This is also consistent with Plaintiffs' theory of the case that Krupiewski and

the other PSP Defendants' conduct are part and parcel of a derelict, permissive atmosphere and

practice permeating the PSP.  Plaintiffs have presented a genuine issue of material fact as to whether

Krupiewski acted with deliberate indifference in these circumstances.  Accordingly, Krupiewski's

Motion for Summary Judgment is denied.

### 4.  Lieutenant Kreiser

Kreiser was the Troop K station commander from May 1998 through October 2000.

In that capacity he oversaw approximately sixty (60) PSP sergeants, corporals, troopers and civilian

personnel.  Evans was in Kreiser's chain of command from May 1998 through October 1999.

Plaintiffs have presented evidence that in September 1998, Krupiewski informed

Kreiser about the R.S. incident allegations.  Kreiser Dep. at 208.  Rather than document this incident

as required by PSP policy (an obligation Kreiser acknowledges would attach under Plaintiffs'

version of the facts, see id. at 61-62), Kreiser directed Krupiewski to await further information from

the assistant district attorney and keep him advised of further developments.  Id. at 208; Krupiewski

Dep. at 269-70.  Krupiewski did so and later informed Kreiser that the matter had been resolved and

that it was all a "misunderstanding."  Id. at 292.  Krupiewski relayed this information to Kreiser,

who instructed Krupiewski to await a follow-up letter from R.S.'s attorney, James Fox, expecting

that it would include details of R.S.'s allegations.  Id. at 295-96, 307-08.  When Krupiewski received

the September 4, 1998 letter, it did not include any specific allegations concerning Evans' conduct. Id. at 308. Soon thereafter, Krupiewski gave the letter to Kreiser and explained that the letter concerned allegations that, while on patrol, Evans had detained a couple and discussed videotaping and sex. Id. at 312-13. Kreiser told Krupiewski that he would handle the matter.[24] Id. at 305. Krupiewski assumed a formal investigation would follow. Id. at 340.

In fact, Kreiser failed to comply with his duty to report the R.S. incident, and PSP did not undertake any investigation of it. On November 17, 1998, Corporal Murray discussed the R.S. incident with Kreiser in the course of Murray's investigation of the nude photograph incident. Kreiser gave Murray a copy of Fox's letter. Murray Dep. at 552-53. Kreiser also informed Corporal Murray that Krupiewski had looked into the R.S. incident and learned it was a misunderstanding, and that therefore Kreiser considered the matter to be closed. Id. at 543-47. In reliance on this statement, Murray did not question Krupiewski about the R.S. incident during their subsequent December 1, 1998 interview or take any other investigatory actions. Id. at 555-56.

Plaintiffs have also produced evidence that Kreiser learned on September 17, 1998 that Evans had been showing other troopers photographs of a nude woman posed in front a PSP vehicle and that Kreiser seized these photographs from Evans' locker. Kreiser also learned that the woman was a prostitute whom Evans had solicited from a telephone located inside the PSP barracks and later paid for sex. Kreiser Dep. at 328-29. Kreiser took no action for almost two months.

It was not until November 12, 1998 that Kreiser initiated the complaint regarding the nude photograph incident that led to Corporal Murray's subsequent investigation. In his interview

---

[24] Kreiser claims that he did not learn of R.S.'s allegations until November 1998, when Krupiewski gave him the letter from James Fox. Kreiser Dep. at 155-56, 174-75, 178. However, on this motion for summary judgment, the Court resolves factual disputes in favor of Plaintiffs, the non-moving parties.

with Murray, Kreiser stated that he occasionally had heard rumors concerning Evans and expressed concern that these rumors were always sexual in nature.  He specifically mentioned the R.S. incident, although as noted above, told Murray that he considered the matter closed, despite the fact that there had never been any meaningful investigation.  In addition, Kreiser told Murray he was aware that Evans had been investigated for "making inappropriate comments" to A.B.  Kreiser also told Murray that in "his opinion Trooper Evans is building a track record of sexually related complaints."  General Investigation Report, Dec. 22, 1998, BPR 11012, at 7-10.  Kreiser also testified that because the nude photograph incident was "unbecoming," he wanted Evans transferred out of his barracks.  Kreiser Dep. at 364-65.

To summarize, in early 1999, Kreiser knew:  (1) that Evans had made inappropriate sexual comments to R.S. during a DUI stop concerning videotaping and sex; (2) that Evans had taken naked photographs of a stripper or prostitute posing with a PSP vehicle, and that he later paid that woman for sex; and (3) that Kreiser knew Evans had been investigated for making inappropriate sexual comments to a minor.  In addition to having knowledge of the foregoing, Kreiser had heard rumors about Evans that were sexual in nature, and these rumors caused Kreiser to become personally concerned about Evans' conduct.

For substantially the same reasons accounted above as to Krupiewski's Motion for Summary Judgment, Kreiser's motion is denied.  The quantity of information known to Kreiser would have compelled any reasonable Troop K station commander to act to prevent Evans from causing harm to the community.  Kreiser became Troop K station commander in May 1998 and in only a few months became aware of three separate, serious incidents of alleged sexual misconduct by Evans.  Moreover, these incidents occurred in rather rapid succession, with all three taking place

in a little over a year.  Cf. Beck, 89 F.3d at 973 ("Because the complaints . . . came in a narrow period of time and were of similar nature, a reasonable jury could have inferred that the Chief of Police knew, or should have known, of Williams' propensity for violence when making arrests.") (citing Parrish, 963 F.2d at 205).  This is sufficient evidence from which a reasonable jury could conclude that, despite having knowledge that Evans had engaged in repeated instances of sexual misconduct, and despite his own personal beliefs that Evans' conduct was "unbecoming" and was taking the form of a "track record" of sexual misconduct, Kreiser failed to take appropriate action to protect against the risk to the community.  See Parrish, 963 F.2d at 203-05.  Plaintiffs have presented a genuine issue of material fact as to whether Kreiser acted with deliberate indifference in these circumstances.  His Motion for Summary Judgment is denied.

### 5.    Captain LaCrosse

Captain LaCrosse was a Troop K Commanding Officer, overseeing approximately 200 troopers and twenty-five civilians, including those stationed at Skippack.  He reported to Area Commander Major Werts.  He also served as fact finder for the BPR investigations of Troop K members.  In that capacity LaCrosse served as the adjudicator of the A.B. complaint.

In February 1998, LaCrosse determined that A.B.'s charges were "unfounded," and prepared a report outlining his reasoning.  See General Investigation Report, dated Feb. 9, 1998.  In reaching his decision, LaCrosse reviewed the internal investigation report prepared by Corporal Murray but did not speak with Corporal Murray before adjudicating the A.B. complaint.  Id.; Murray Dep. at 182.  However, prior to reaching his determination, LaCrosse did consult with Lieutenant Hunsicker, the polygraph unit coordinator.  LaCrosse did this despite knowing that Hunsicker, as an officer in two police unions of which Evans was a member, had a potential conflict of interest.

LaCrosse knew of this conflict of interest and stated that he also knew Hunsicker "is supposed to be on the other side of the fence trying to aid these individuals that get themselves in trouble." Yet, LaCrosse permitted Hunsicker to review the polygraph charts because he "felt more than one head is better than one." Transcription of Interview with Captain Thomas J. LaCrosse, Jan. 15, 2001, at 8. Plaintiffs argue that Hunsicker's position of power, coupled with his "inappropriate" participation in the A.B. investigation, may have had some improper influence on LaCrosse's final determination in the A.B. investigation. Id. at 194-95; Hunsicker Dep. at 202; Plaintiffs' Joint and Consolidated Response to Summary Judgment Motion of the PSP Defendants and Defendant Gary Fasy at 53-54; Brose Dep. at 510.

Plaintiffs also allege that LaCrosse's report reveals numerous inconsistencies and even evidence of a conspiracy to pre-determine A.B.'s polygraph results. As such, they contend, LaCrosse's reliance on misrepresentations and unreliable polygraph results was erroneous, and taints his ultimate determination. Although he had the power to do so, LaCrosse did not request that Evans submit to a polygraph test during the investigation. See LaCrosse Dep. at 164-69.

LaCrosse also served as the adjudicator for the nude photograph incident. In making his determination, LaCrosse reviewed the general investigation report prepared by Corporal Murray. See General Investigation Report, Dec. 22, 1998. Having read this report by January 7, 1999, LaCrosse possessed the same knowledge possessed by Werts, as described supra. LaCrosse Dep. at 323. That is, LaCrosse knew that Evans had displayed photographs of a naked stripper or prostitute posing with a PSP vehicle and that Evans told at least one trooper that he had sex with the woman in a PSP vehicle. In addition, having reviewed the investigation report, LaCrosse would have been aware of multiple circulating rumors of Evans' sexual misconduct, including that (1)

Kreiser was concerned that such rumors "were always sexual in nature," and that Evans was "building a track record of sexually related complaints"; (2) Evans masturbated in the parking lot of the Trappe Tavern, although the incident was described therein as a "rumor of unknown origin" with "no substance to support it";[25] (3) Evans made inappropriate comments of a sexual nature during a DUI stop; (4) Evans' flirtation with a female during a rape investigation caused concern that the woman's boyfriend would become violent; (5) a police corporal described Evans as a "hormonal sex freak trying to pick up young girls" and stated that "Trooper Evans' sexual appetite is going to cause the Pennsylvania State Police great embarrassment in the future"; (6) Evans liked to brag about his escapades with women; (7) Evans responded to incidents "not to assist, but to talk to girls if there are any around"; (8) Krupiewski favored Evans, who was considered by some to be Krupiewski's "golden boy," and that this protective relationship discouraged some troopers from reporting Evans' misconduct; (9) one unbiased trooper opined that Evans "needs help," that Evans "can't control himself when he's around a female," and that Evans' "sexual fixation is going to get someone hurt"; and (10) Evans made a statement to another trooper that he "got away with" the incident where the young girl accused him of misconduct. General Investigation Report, Dec. 22, 1998, BPR 11012, at 7-11.

On January 7, 1999, LaCrosse sustained the complaint against Evans. In a subsequent meeting with Evans, LaCrosse contends he told Evans that if another complaint of a sexual nature arose, LaCrosse would "dedicate [his] professional life to seeing him off the job."

---

[25] There is evidence that LaCrosse had prior independent knowledge of the Trappe Tavern masturbation incident. According to one trooper, LaCrosse may have been interviewing troopers about this incident as early as the spring of 1997. See Altieri Dep. at 67-69. It bears mentioning, however, that there is no evidence that any officers knew that Evans had displayed his weapon, and thereby exerted coercive force, during his encounter with K.P. in the Trappe Tavern parking lot. While there were rumors concerning Evans' masturbating, the details of the encounter did not come to light until after Evans' arrest.

LaCrosse Dep. at 340.  On January 22, 1999, LaCrosse determined that disciplinary action against Evans was warranted and issued a Disciplinary Action Report.  The department disciplinary officer, Larry Williams, ultimately imposed a three day suspension without pay.  See Memorandum of 3/25/99 from Williams to Commanding Officer of Troop K.

Viewing the evidence in a light most favorable to Plaintiffs, there is evidence that LaCrosse failed to act in the face of a "risk of constitutionally cognizable harm" that was "so great and so obvious" that his failure to respond appropriately would support a claim of deliberate indifference.  Beers-Capitol, 256 F.3d at 134.  Like Major Werts, LaCrosse learned that Evans was bragging about having "gotten away" with the A.B. incident.  This information should have compelled him to appropriate action in light of the plainly obvious and highly consequential consequences.  Although there is evidence that LaCrosse, in the course of the subsequent nude photograph investigation, later sought to "readjudicate" the A.B. matter by changing his determination from "unfounded" to "not sustained," Lieutenant Colonel Coury advised him to leave his determination undisturbed because LaCrosse's proposed change "made no difference."  Coury Dep. at 214-16.  Taken in context and in a light most favorable to Plaintiffs, LaCrosse proposed to make a mere rhetorical, non-substantive change that would have had no impact on the ultimate outcome.  Furthermore, if LaCrosse had wanted to submit additional information on the closed A.B. complaint, PSP procedures permitted him to prepare a supplemental report, which he failed to do. Id. at 216.  Accordingly, that LaCrosse made some effort to revisit his A.B. determination lends little support to his argument that he did not act with deliberate indifference.  As noted above as to Major Werts, the facts known to LaCrosse create the reasonable inference that A.B.'s allegations were true. The mere suggestion that a state police trooper had committed sexual misconduct involving a young

girl is so egregious, and presents such a compelling risk of constitutional harm, that a reasonable jury could conclude that LaCrosse's response was deliberately indifferent.

As with Werts, LaCrosse would have been aware from the investigation report that rumors concerning Evans' sexual obsession were rampant.  He also would have been aware that several troopers had expressed serious concern about Evans' conduct and had predicted (all to presciently) that Evans would one day inflict harm to the public.  Plaintiffs have also presented evidence that LaCrosse permitted an interested party, Hunsicker, to participate and possibly influence the outcome of an investigation so as to favor Evans, thus permitting a reasonable jury to question LaCrosse's attention to protocol and perhaps his motives.  Moreover, considering the sheer volume and nature of the material recounting Evans' misconduct, a reasonable jury could conclude that LaCrosse must have known that Evans presented an obvious, serious risk of constitutional harm to the public.  See Beers-Capitol, 256 F.3d at 134.

Finally, as with Werts, a reasonable jury could conclude that LaCrosse's failure to respond appropriately to Evans' misconduct communicated to his subordinates (many of whom had reported rumors of Evans' misconduct) that Evans' malfeasance was not taken seriously, that light punishment is the appropriate response to serious acts of sexual misconduct, and that therefore such conduct is tacitly approved.  See Oliva, 226 F.3d at 202.  It is insignificant that LaCrosse gave Evans a verbal warning regarding the nude photograph incident.  Such a flaccid response was clearly insufficient in light of the volume and content of information known to LaCrosse at that time, and is in fact further evidence of LaCrosse's deliberate indifference in the face of a grave and obvious risk of constitutional harm to the public.  Accordingly, LaCrosse's motion for summary judgment is denied.

### 6.    Sergeant Fasy

Fasy served as Administrative Supervisor at the Limerick Barracks and later at the Skippack Barracks.  Fasy Dep. at 47, 129-30.  Evans was never in Fasy's direct chain of command, but Fasy outranked Evans.  Fasy testified that as a ranking officer, he would have authority over subordinate troopers and would be "expected to act in that capacity."  Id. at 21-22.  As an initial matter, Fasy asserts that the claims against him are untenable since he was not Evans' direct supervisor and was never otherwise in the same chain of command as Evans.  Nevertheless, because Fasy admits having had general supervisory authority over troopers at the Limerick and Skippack barracks, the Court rejects his argument that supervisory liability cannot be imposed.  See Smith v. Mensinger, 293 F.3d 641, 651 (3d Cir. 2002) (noting that "liability for the failure to intervene is not limited to supervisors or officers who outrank their offending colleagues").  Even if the Court were to accept Fasy's argument, whether he exercised supervisory authority over Evans presents a factual dispute that cannot be resolved on a motion for summary judgment.

Fasy heard "vague" rumors in early 1998 that Evans was under investigation for improper conduct involving a young girl.  Fasy Dep. at 35.  Thereafter, in April 1998, Fasy fielded a telephone call from Christine Haber, the mother of young runaway Ashley Haber.  Ms. Haber reported to Fasy that her daughter was acting "weird" and "strange" after having been with Evans and that she believed something happened between them.  Although Fasy denies it, there is evidence that Ms. Haber reported to Fasy that Evans "made a pass" Ashley.  General Investigation Report, dated June 1, 2001 at 4.  In response to Ms. Haber's concerns, Fasy expressed to Ms. Haber that Evans "seems OK."  Fasy Dep. at 81.  Contrary to PSP policy, Fasy failed to document the phone call or initiate a complaint.  Although Ms. Haber told Fasy she did not wish to initiate a complaint,

PSP policy requires documentation of complaints regardless of a complainant's wishes.

Also in the spring of 1998, Fasy saw the nude photograph in Evans' locker. He knew it was inappropriate for Evans to possess or produce such material and that he should have reported it. Nonetheless, Fasy failed to take the photograph from Evans, report the incident to Evans' superiors, contact BPR or take any other proper action. Id. at 132-36. A subsequent investigation found Fasy guilty of failing to report the existence of the photographs. See General Investigation Report of Jan. 7, 1999. Fasy was verbally counseled, but no other disciplinary action was taken.

The record also contains evidence that as early as 1998 Fasy had knowledge that Evans had a sexual relationship with E.Z., whom Evans met during a domestic abuse call in 1997. Evans had sex with E.Z. while on duty, and subsequently harassed her. A PSP Report reflects that E.Z. informed Fasy of Evans' inappropriate conduct, but that Fasy did not take action against Evans. See General Investigation Report of July 1, 2001. In her statement made in connection with the criminal investigation E.Z. claimed that Fasy falsely reported to her that Evans was being investigated and that he had been put on desk duty. Id. at 4; 5/4/00 Statement of E.Z. The record contains facts from which a jury could conclude that after being informed of the Evans-E.Z. relationship, instead of reporting the conduct, Fasy had sexual relations with her himself. Fasy Dep. at 70-77.[26]

There is also evidence that in July 1998, both Fasy and Evans came into contact with a woman who reported harassment by her husband. Thereafter Fasy called the woman at home and

---

[26] Fasy admits that he had consensual sexual relations with E.Z.; however, he specifically denies that he knew of Evans' relationship with her. Fasy Dep. at 70-77. The General Investigation Report attached to Fasy's Motion for Summary Judgment notes that E.Z. "stated that she told Sergeant Fasy everything about her relationship with Trooper Evans" in 1998. Thus, factual issues are in dispute over whether Fasy knew of Evans' improper relations with E.Z.

warned her "not to get involved with Trooper Evans because there was a complaint about Trooper Evans and a teenage girl." Plaintiff's Ex. 63.

Although Evans and Fasy both testified that they did not socialize, Evans testified that on one occasion Fasy engaged in group sex with Evans and another woman. Fasy denies that this incident occurred. The woman involved told police that Evans and Fasy asked her to perform sex acts and that she refused. See Evans Dep. at 82-89; Fasy Dep. at 29, 50-51. The Court must resolve this factual dispute in favor of Plaintiffs, and thus accepts Evans' version of events.

Plaintiffs argue that Fasy was deliberately indifferent to Evans' acts of misconduct and that he should therefore be held liable on a failure to supervise theory. They have marshaled enough evidence to withstand Fasy's Motion for Summary Judgment. Fasy's failure to document Ms. Haber's report of Evans' misconduct involving Ashley Haber is evidence of his deliberate indifference. From Plaintiffs' evidence a reasonable jury could conclude that Fasy was confronted with information that Evans may have attempted to molest or engage in sexual contact with a young girl and that Evans' attempt had caused her distress. Rather than comply with his obligation to report this information, Fasy responded by defending Evans, despite having heard rumors of a separate incident of misconduct involving Evans and another young girl. A reasonable jury could conclude that this incident of harm to Ashley Haber was so great and so obvious that Fasy's failure to respond appropriately could support a finding of deliberate indifference. Beers-Capitol, 256 F.3d at 137.

There is additional evidence in the record which could support this conclusion and would allow a jury to conclude that Fasy tacitly approved of Evans' sexual misconduct. His failure to report the incidents involving the nude photographs and Evans' on-the-job sexual liaisons with

E.Z. are two examples.  Plaintiffs' evidence concerning Fasy's participation in group sex certainly demonstrates that Fasy was willing to troll the moral low ground with Evans.  More importantly, however, it supports Plaintiffs' theory that an atmosphere of permissiveness and tolerance around sexual escapades permeated the ranks of PSP, and thus goes to Fasy's acquiescence and condonation of misconduct of this variety.  Accordingly, a reasonable jury could conclude that Fasy was deliberately indifferent.  Fasy's motion for summary judgment is denied.

### 7.      Sergeant Brose and Lieutenant Hunsicker

Sergeant Brose was the Quality Control Officer of the Polygraph Unit of the PSP, and Lieutenant Hunsicker was the polygraph unit coordinator.  These defendants were not in Evans' chain of command.  Defendants argue that Plaintiffs cannot make out a § 1983 deliberate indifference claim against Brose and Hunsicker.  See Defendants' Motion at 41-42.  As the Court reads Plaintiffs' Response,[27] however, Plaintiffs do not attempt to rebut Brose and Hunsicker on this point, arguing instead that they are members of an affirmative conspiracy to deprive constitutional rights.  See, e.g., Plaintiffs' Response at 135-52 (arguing deliberate indifference of various PSP defendants, but not Brose and Hunsicker); id. at183-86 (discussing alleged conspiracy and arguing Brose and Hunsicker are not entitled to qualified immunity).  Accordingly, Plaintiffs have waived their opportunity to contest the basis for Defendants' motion.  To the extent that Plaintiffs make passing reference to constitutional claims against "all defendants" for failure to supervise, see, e.g., Plaintiffs' Response at 125, this is insufficient to preserve such an argument against waiver.  See, e.g., Reynolds v. Wagner, 128 F.3d 166, 178 (3d Cir. 1997) ("an argument consisting of no more

---

[27] Plaintiffs' Response brief is not a paragon of lucidity or tidy organization.  Rather, it appears to be a product of the "quantity over quality" school of legal writing.  Notwithstanding this shortcoming, the facts alleged concerning Brose and Hunsicker would seem to go to a conspiracy claim, not a failure to supervise claim.

than a conclusory assertion . . . will be deemed waived"); Greenwood Partners, L.P. v. Cimnet, Inc.,

Civ. A. No. 01-6624, 2003 WL 22238981, at *2 (E.D. Pa. Sept. 26, 2003) (Giles, C.J.) ("Where a

party makes no more than a single mention of a claim, the claim is consequently waived.").  In any

event, having failed to attack head-on Brose and Hunsicker's argument that they cannot be held

liable under a deliberate indifference theory, Plaintiffs have failed to meet their burden under Fed.

R. Civ. P. 56(e) to "set forth specific facts showing that there is a genuine issue for trial."

Accordingly, insofar as Plaintiffs actually do seek to pursue claims against Brose and Hunsicker

under this theory, summary judgment is granted.

### D.    CIVIL CONSPIRACY

As stated supra at note 4, Plaintiffs have agreed to the dismissal of their conspiracy

claims premised on 42 U.S.C. § 1985 (conspiracy to interfere with civil rights) and 42 U.S.C. § 1986

(action for neglect to prevent § 1985 violations).[28]  However, Plaintiffs remain steadfast in their

contention that they can maintain a § 1983 civil conspiracy claim against Defendants LaCrosse,

Brose, Hunsicker, Krupiewski, Fasy, Kreiser, Werts, Coury, Conley and Evanko.  See Plaintiffs'

Response at 153-63.

To establish civil conspiracy under § 1983, a plaintiff must establish (1) the existence

of a conspiracy and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the

conspiracy.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 158 (1970).  A plaintiff may use

circumstantial evidence in order to prove the conspiracy.  Hampton v. Hanrahan, 600 F.2d 600, 621

(7th Cir. 1979).  An express agreement among all conspirators is not a necessary element of civil

---

[28]  Unlike § 1983 and § 1986 claims, state action is not an essential ingredient of a § 1985(3) conspiracy claim.  See Grecken v. Breckenridge, 403 U.S. 88 (1971).

conspiracy as long as the participants in the conspiracy share a general objective or the same motives for desiring the intended conspiratorial result. Id. "To demonstrate the existence of a conspiratorial agreement, it simply must be shown that there was a 'single plan, the essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences.'" Id. (quoting Hoffman-Larouche, Inc. v. Greenberg, 447 F.2d 872, 875 (7th Cir. 1971)). The fact that evidence points in different directions and conflicting inferences might be drawn from it "does not justify judicial intrusion into the jury's role in determining whether a civil conspiracy existed." Hampton, 600 F.2d at 621 (citing Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 700-01 (1962)).

Plaintiffs have presented prima facie evidence to show that LaCrosse, Hunsicker, and Brose conspired with Evans to cover up the A.B. incident. Numerous irregularities in the investigation constitute evidence from which there could be found a concerted effort to distort facts, misread the polygraph results and improperly adjudicate the charges against Evans. As adjudicator for the A.B. investigation, LaCrosse was responsible for having Hunsicker review the A.B. polygraph charts despite an apparent conflict of interest. Moreover, there is evidence that LaCrosse, Brose and Hunsicker may have manipulated polygraph results in an earlier, unrelated PSP investigation. Record retention policies regarding scoring sheets were not followed, and there is a factual question as to whether a fourth examiner (who purportedly detected deception) even reviewed the A.B. polygraphs. Additionally, in connection with the instant litigation a polygraph expert rendered the opinion that the conclusions of Brose and Hunsicker were unsupportable.

While the Court does not pass on the ultimate validity of Plaintiffs' conspiracy claim against LaCrosse, Brose and Hunsicker, there is evidence from which a jury could reasonably infer

that a conspiracy existed.  Viewing the evidence in the light most favorable to Plaintiffs, there is sufficient circumstantial evidence from which the trier of fact could conclude that Brose and Hunsicker intentionally misinterpreted the polygraph test results in order to protect a fellow trooper from an adjudication of conscience-shocking sexual misconduct and that LaCrosse adjudicated the A.B. complaint with an understanding thereof.  Because a jury could find that LaCrosse, Brose and Hunsicker acted in concert with Evans and that they encouraged and promoted a pattern of constitutional violations, as co-conspirators these parties may be jointly liable with Evans for his subsequent constitutional violations.   See Melo v. Hafer, 912 F.2d 628, 638 (3d Cir. 1990); Grandstaff v. City of Borger, 767 F.2d 161, 168 (7th Cir. 1985).

While Plaintiffs also assert separate civil conspiracy claims against Krupiewski, Fasy and the various Freemason PSP Defendants, those claims appear to be based more upon speculation than fact.  The conspiracy claim against Krupiewski is based upon his failure to promptly report and document the R.S. complaint, and that he may have shown favoritism to Evans.  The conspiracy claim against Fasy is based on his alleged knowledge of Evans' affair with E.Z. and Evans' possession of the nude photograph, as well as their personal interaction, including their engaging in group sex.  Plaintiffs, however, fail to establish the existence of a tacit or express agreement between these defendants and Evans, or that these defendants and Evans had the same motives for desiring the intended conspiratorial result.  Plaintiffs' vague allegations are insufficient to overcome summary judgment.  Accordingly, the Court will enter judgment in favor of the PSP Defendants on all civil conspiracy claims other than those advanced against LaCrosse, Brose, and Hunsicker.[29]

---

[29] The conspiracy claim against the Freemason Defendants is based upon charges in an anonymous cartoon that the Freemason Defendants conspired to protect Evans.  This conspiracy claim, too, lacks a sufficient factual basis to allow it to proceed to a jury.

The Court must next turn to whether the remaining Defendants are entitled to summary judgment based on their asserted defense of qualified immunity. Because of the disposition outlined above, and because Defendants do not assert qualified immunity as to the civil conspiracy claims, the Court's qualified immunity discussion is limited to the issue of Plaintiffs' failure to supervise claims.

## QUALIFIED IMMUNITY

The defense of qualified immunity shields government officials performing discretionary acts from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). It is a defendant's burden to establish that he or she is entitled to qualified immunity. Beers-Capitol, 256 F.3d at 142 n.15) (citing Stoneking, 882 F.2d at 726). The privilege is not a mere defense; rather, it is an immunity from suit. Its purpose "is to protect public officials from liability in situations involving extraordinary circumstances and where they neither knew nor objectively should have known the appropriate legal standard." Andrews, 895 F.2d at 1480.

The Supreme Court reiterated in Saucier v. Katz, 533 U.S. 194, 200-01 (2001) that courts should use a two-step process in ruling on qualified immunity. First, the Court must consider whether the facts alleged, taken in the light most favorable to Plaintiffs, show that Defendants' conduct violated a constitutional right. See id. at 201. "If the plaintiff fails to make out a constitutional violation, the qualified immunity inquiry is at an end; the officer is entitled to immunity." Bennett v. Murphy, 274 F.3d 133, 136 (3d Cir. 2001).

However, if "a violation could be made out on a favorable view of the parties'

submissions, the next, sequential step is to ask whether the right was clearly established." <u>Saucier</u>, 533 U.S. at 201. "The relevant dispositive inquiry" in making this determination is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." <u>Id.</u> at 202. This does not entail identifying a generalized, abstract constitutional right such as the right to be free from unreasonable seizures. Rather, it requires that the Court determine on a more "particularized" level that it was "sufficiently clear that a reasonable official would understand that what he [was] doing violates that right." <u>Id.</u> Whether the facts alleged support a claim of a violation of clearly established law is a "purely legal" question for the Court. <u>Johnson v. Jones</u>, 515 U.S. 304, 313 (1995).

With these standards in mind, the Court will proceed to analyze Plaintiffs' claims. Because Plaintiffs seek to hold Evans' supervisors liable under § 1983, the Court must conduct this analysis for both the subordinate (Evans) and his supervisors (PSP Defendants). That is, the Court must determine whether "both the law allegedly violated by the subordinate and the supervisory liability doctrine was clearly established" at the time of the alleged incidents.[30] <u>Poe v. Leonard</u>, 282 F.3d 123, 126 (2d Cir. 2002); <u>Camilo-Robles v. Hoyos</u>, 151 F.3d 1, 6 (1st Cir. 1998) ("[F]or a supervisor to be liable there must be a bifurcated 'clearly established' inquiry - - one branch probing the underlying violation, and the other probing the supervisor's liability."). Defendants contend that the law governing Evans' conduct was not clearly established.

Thus, the Court first must determine whether the facts alleged, taken in the light most favorable to Plaintiffs, show that Evans' conduct violated a constitutional right. Where a police

---

[30] The Third Circuit has not adopted this sequential analysis, but it appears to be correct and consistent with the doctrine of qualified immunity. <u>See</u> <u>Poe</u>, 282 F.3d at 134-35 (explaining rationale for analyzing whether both laws were clearly established).

officer exercises unreasonable dominion over a suspect in custody, there may be a violation of the Fourth Amendment. Fontana v. Haskin, 262 F.3d 871, 878-79 (9th Cir. 2001) (noting that sexual advances by police officer may constitute an "unreasonable intrusion on one's bodily integrity" in violation of the Fourth Amendment). To the extent that Plaintiffs were not in custody, the appropriate analysis is under the Fourteenth Amendment. Id. at 881-82.

The Supreme Court has long recognized a substantive due process right to bodily integrity. See Rochin v. California, 342 U.S. 165, 172 (1952) (forcibly extracting contents of suspect's stomach shocks the conscience and violates substantive due process). While not every tort committed by a state actor is transformed into a constitutional violation, the appellate courts have consistently found due process violations when state actors have engaged in sexual misconduct. See, e.g., Haberthur v. City of Ramore, 119 F.3d 720, 723 (8th Cir. 1997) (recognizing due process right to be free from unwanted fondling and touching); Jones v. Wellham, 104 F.3d 620, 628 (4th Cir. 1997) (noting that forcible rape by police officer violates due process rights); Does v. Taylor Indep. Sch. Dist., 15 F.3d 443, 450-52 (5th Cir. 1994) (holding that physical sexual abuse of student by school employee violated due process rights); Black by Black v. Indiana Area Sch. Dist., 985 F.2d 707, 709 n.1 (3d Cir. 1993) (student plaintiffs alleging sexual molestation by school bus driver have liberty interest in bodily integrity); Sepulveda v. Ramirez, 967 F.2d 1413, 1415-16 (9th Cir. 1992) (finding clearly established right to bodily privacy while supplying urine sample).

The threshold question in making a determination as to whether a substantive due process violation has occurred is "whether the behavior of the governmental officer is so egregious, so outrageous, that it may be fairly said to shock contemporary conscience." County of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998); Schieber v. City of Philadelphia, 320 F.3d 409, 417-19 (3d

Cir. 2003).   Evans' conduct toward Plaintiffs Maslow, Doe, and Weller was unquestionably shocking to the conscience.   Considering Plaintiffs' allegations in the case at bar, most of which are not factually disputed due to Evans' guilty pleas, Evans' use of his coercive power attendant to his status as a state trooper to violate the intimate bodily integrity of these female citizens is an utterly unacceptable practice.   See Stoneking, 882 F.2d 720 (holding that female high school student who had been sexually abused and forced to engage in sexual acts with a band director could maintain a § 1983 civil rights action against the school district).   A Fourteenth Amendment right to be free from sexual abuse by public employees may be advanced notwithstanding the absence of physical force.   Id.; see also Rogers v. City of Little Rock, 152 F.3d 790, 797 (8th Cir. 1998) ("Rogers was able to establish a due process violation absent physical force because such violation can be based on mental coercion.").

In these cases, Evans' conduct was sufficiently coercive, and so egregious and outrageous that it may be fairly said to shock one's conscience.   Defendants' arguments to the contrary are wholly without merit.[31]   Evans' sexual predation was an arbitrary exercise of the powers of government.   Accordingly, the Court concludes that Maslow and Doe have set forth Fourteenth Amendment violations and that Weller has advanced constitutional claims under both the Fourth and Fourteenth Amendments.

Because Plaintiffs have presented sufficient evidence from which a reasonable jury

---

[31] For example, Defendants argue that "exposing oneself in conjunction with verbal harassment does not clearly constitute a constitutional violation."   PSP Defendants' Memorandum of Law in Support of Motion for Summary Judgment at 60.   In support of this position, they cite Yelverton v. Sherman, No. 87-CV-0294, 1990 WL 18826 (E.D. Pa. Feb. 27, 1990), a case where a district court dismissed the claims of an inmate who alleged that a prison guard verbally harassed the plaintiff and exposed himself.   The conduct in Yelverton was limited to degrading exposure, perhaps flashing, and did not involve any touching or masturbation.   Accordingly, the Court rejects Defendants' argument that Plaintiffs in this case have not set forth a clearly established constitutional claim.

could conclude that Evans violated their constitutional rights, the Court must next ask whether those rights were clearly established at the time Plaintiffs' claims arose. That is, would it be clear to a reasonable officer in Evans' position that his conduct (unwanted sexual advances and improper touching) was unlawful in the situations he confronted? Because it was clearly established in early 1999 (the time of Evans' alleged misconduct against Weller) that Plaintiffs possessed a right to be free from intrusions to their bodily integrity at the hands of a state actor, the Court concludes that Evans violated Plaintiffs' clearly established rights.

When inquiring as to whether a right is clearly established, the Third Circuit has directed district courts to make reference to judicial precedent. See, e.g., McLaughlin v. Watson, 271 F.3d 566, 571 (3d Cir. 2001) ("clearly established" means "some but not precise factual correspondence" between "relevant precedents and the conduct at issue"), cert. denied, 535 U.S. 989 (2002)). A particular realm of conduct is not protected by qualified immunity merely because it has not been held unlawful before. See Brown, 269 F.3d at 211. The Third Circuit has adopted a "broad view" of what constitutes an established right of which a reasonable person would have known. Burns v. County of Cambria, 971 F.2d 1015, 1024 (3d Cir. 1992). Precise factual correspondence between relevant precedents and the conduct at issue is unnecessary. "If the unlawfulness of the defendant's conduct would have been apparent to a reasonable official based on the current state of the law, it is not necessary that there be binding precedent from this circuit so advising." Brown, 269 F.3d at 212 n. 4; Stoneking, 882 F.2d at 726 ("We expect officials to 'apply general, well-developed legal principles.'") (quoting People of Three Mile Island v. Nuclear Regulatory Comm'n, 747 F.2d 139, 144 (3d Cir. 1984)).

In some factual contexts, such as those involving outrageous conduct by state actors,

this exercise must appear unthinkingly mechanical, and almost without meaning.  See Stoneking,

882 F.2d at 726 ("It may seem ludicrous to be obliged to consider whether it was 'clearly

established' that it was impermissible for school teachers and staff to sexually molest students.").

This is such a case.  It is beyond question that when Plaintiffs' claim arose it was a clearly

established principle of law that a state actor violates another's constitutional rights when he

sexually assaults that person in the course of an arrest, or transports a person to her house and then

forcibly performs oral sex, or otherwise uses his authority as a state official to force himself sexually

upon an unwilling victim.  Even if no case had ever proclaimed it so, it would be manifestly clear

to any reasonable officer that such conduct is unlawful.  Cf. Anderson v. Creighton, 483 U.S. 635,

640 (1987) (in order for conduct to give rise to liability, the "unlawfulness must be apparent").  As

the Eighth Circuit has noted, "[n]o degree of sexual assault by a police officer acting under color of

state law could ever be proper."  Rogers, 152 F.3d at 796.  Sexual abuse under color of law "is so

contrary to fundamental notions of liberty and so lacking of any redeeming social value that no

reasonable individual could believe that sexual abuse by a state actor is constitutionally permissible

under the due process clause."  Doe v. Claiborne County, Tenn., 103 F.3d 495 (6th Cir. 1995).  In

any event, there exists judicial precedent with "some but not precise factual correspondence" to the

instant matter,[32] and the Court does not hesitate to conclude that the law governing Evans' conduct

was clearly established by early 1999, when the misconduct at issue occurred.  See, e.g., Rogers, 152

F.3d at 796 (police officer who stops woman for broken tail light, follows her home and rapes her

violates woman's due process rights); Haberthur, 119 F.3d at 723-24 (holding plaintiffs sufficiently

---

[32] That there are relatively few published opinions addressing these extreme and disgusting circumstances
is perhaps some evidence that this kind of conduct is, thankfully, rare.

allege violation of substantive due process rights where police officer reached his hand under plaintiff's shirt, fondled a "private erogenous zone," and "caressed her body while making sexually suggestive remarks"); Bennett v. Pippin, 74 F.3d 578, 589 (5th Cir. 1996) (sheriff's rape of murder suspect violates substantive due process rights); Taylor Indep. Sch. Dist., 15 F.3d at 451 ("surely the Constitution protects a schoolchild from physical sexual abuse--here, sexually fondling a 15-year old girl and statutory rape--by a public schoolteacher."); Stoneking, 882 F.2d at 726 ("constitutional right . . . to freedom from invasion of her personal security through sexual abuse[] was well established" in 1980); Dill v. Oslick, No. Civ.A.97-6753, 1999 WL 508675, at *5 (E.D. Pa. July 19, 1999) (prisoner's right "not to be sexually assaulted by a guard" and "right to freedom from invasion of bodily integrity" were clearly established in 1995).

Having addressed the law applicable to the subordinate, the Court must next determine whether the supervisory liability doctrine, as it applies to this context, was clearly established. See Poe, 282 F.3d at 134 (a supervisor may not be held liable unless the law governing both subordinates and supervisors was clearly established). As set forth above, Plaintiffs have adduced sufficient facts to make out a constitutional violation, thus satisfying the first step in the Saucier analysis. See 533 U.S. at 201.

The Court concludes that it was clearly established by early 1999 that a supervisor who was deliberately indifferent in the face of an unreasonable risk of harm could be held liable under § 1983 if his inaction bore an affirmative causal link to the harm suffered by the plaintiff. See, e.g., Shaw v. Stroud, 13 F.3d 791, 802 (4th Cir. 1994); Black, 985 F.2d at 712 (plaintiff can establish liability by demonstrating that defendant's conduct "played an affirmative role in bringing about the sexual abuse and that the [supervisor] acted with deliberate indifference to that abuse"); Stoneking,

882 F.2d at 730 (by 1981 "it was clearly established law that [supervisory] officials may not with impunity maintain a custom, practice or usage that communicated condonation or authorization of assaultive behavior"); Harris v. City of Pagedale, 821 F.2d 499, 505-06 (8th Cir. 1987) (finding deliberate indifference where city officials were notified on "repeated occasions" of employee misconduct but "repeatedly failed to take any remedial action"); C.M. v. Southeast Delco Sch. Dist., 828 F. Supp. 1179, 1185 (E.D. Pa. 1993) (school administrators may have acted with deliberate indifference as to teacher's physical, verbal and sexual abuse of students when other teachers made multiple complaints to administrators, complaints conveyed message that teacher was a "depraved and dangerous man," and administrators knew of students' reluctance to report abuse).  The Court is satisfied that these cases, as well as those discussed above, present rules of law and factually analogous circumstances that would inform a reasonable supervisor in Defendants' positions and compel them to act differently than Plaintiffs allege they acted here.

        In pressing their case for qualified immunity, Defendants argue that reasonable individuals, confronted with the circumstances they were facing, could disagree as to the legality of their actions or inactions.  The Court is mindful that qualified immunity protects all but the "plainly incompetent" and serves to protect public officials where they neither knew nor should have known their legal obligations.  Malley v. Briggs, 475 U.S. 335, 341 (1986); Andrews, 895 F.2d at 1480.  Again, the scope of clearly established law is broadly viewed in the Third Circuit, and there need not be factually exact precedent on point.  Given the nature, quality and quantity of scandalous and troubling information known to these Defendants, the Court cannot conclude that their legal obligations could have been unclear.  Each of these Defendants was aware that Evans had used his authority as a state trooper improperly and that the objects of his egregious misconduct were, on far

too many occasions, women or young girls in the community.  Defendants contend that it is only with the benefit of hindsight that the extent of Evans' depravity and risk to the community could be known and that these officials acted reasonably at the time.  However, the Court is satisfied that the information known to these Defendants in early 1999 would compel a reasonable officer to intervene and take appropriate steps to prevent Evans from abusing his position of power for his own perverted sexual gratification.  In these circumstances, no reasonable officer could believe that the Constitution demanded less.  Accordingly, these Defendants are not entitled to qualified immunity.[33]

## CONCLUSION

For the foregoing reasons, the PSP Defendants' Motions for Summary Judgment are granted in part and denied in part, and Plaintiffs' Motion to Supplement the Record is granted.  The Court concludes that the PSP Defendants are entitled to summary judgment on the failure to screen in hiring claims.  With respect to the failure to supervise claims, the motion is denied as to Defendants Werts, Krupiewski, Kreiser, LaCrosse, and Fasy   The record contains evidence which could support a finding that these PSP Defendants encouraged, condoned, tolerated and approved of Evans' pattern of sexual misconduct, and that they knew of the risk to Plaintiffs before those injuries occurred.  Nor are these Defendants entitled to qualified immunity.  The motion is also denied with respect to the civil conspiracy claims against LaCrosse, Brose, and Hunsicker.  Furthermore, the motion is denied without prejudice as to Defendants Evanko, Coury, and Conley.

An appropriate Order follows.

---

[33] Defendants do not argue that the law relating to § 1983 civil conspiracies was not clearly established.  Rather, they argue only that on the facts alleged, Plaintiffs fail to make out such a claim.  To the contrary, as explained supra, Plaintiffs have presented prima facie evidence to show that LaCrosse, Hunsicker, and Brose conspired with Evans to cover up the A.B. incident.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| | : | |
| **DENISE MASLOW, LINDA WELLER,** | : | **No. 01-CV-3636** |
| **MARY DOE, NANCY DOE, and L.H.,** | : | |
|     **Plaintiffs** | : | |
| | : | **CONSOLIDATED CASES** |
|     **v.** | : | **No. 00-CV-5660** |
| | : | **No. 00-CV-5805** |
| **MICHAEL K. EVANS, PAUL J. EVANKO,** | : | **No. 01-CV-1538** |
| **THOMAS COURY, HAWTHORNE** | : | **No. 01-CV-2166** |
| **CONLEY, ROBERT G. WERTS,** | : | **No. 01-CV-3636** |
| **THOMAS J. LACROSSE, ROBERT B.** | : | |
| **TITLER, DAVID B. KREISER, DENNIS** | : | |
| **HUNSICKER, KEVIN T. KRUPIEWSKI** | : | |
| **and GARY FASY,** | : | |
|     **Defendants** | : | |
| | : | |

## ORDER

**AND NOW**, this 7th day of November, 2003, for the reasons set forth in the attached Memorandum Opinion, it is hereby **ORDERED** and **DECREED** as follows:

**(1)** The Motion for Summary Judgment of Defendant Sergeant Gary Victor Fasy [Doc. No. 63] is **GRANTED IN PART** and **DENIED IN PART**. The Motion is **GRANTED** insofar as it relates to the state law claims and the 42 U.S.C. § 1983 civil conspiracy claim advanced against Fasy but **DENIED** with respect to the supervisory liability claims. Judgment is entered in favor of Sergeant Gary Victor Fasy and against Plaintiffs Denise Maslow, Linda Weller and Nancy Doe on the 42 U.S.C. § 1983 civil conspiracy and state law claims. Plaintiffs' claims advanced pursuant to 42 U.S.C. §§ 1985(3) and 1986 are **DISMISSED WITH PREJUDICE** pursuant to Fed. R. Civ. P. 41(a)(2).

**(2)** The Motion for Summary Judgment of Defendants Commissioner Paul J. Evanko, Deputy Commissioner Thomas Coury, Major Hawthorne Conley, Major Robert G. Werts, Captain

Thomas J. LaCrosse, Captain Robert B. Titler, Lieutenant David B. Kreiser, Lieutenant Dennis Hunsicker, Sergeant Kevin T. Krupiewski, Corporal Gary L. Dance, Jr., Corporal Laura Bowman, Corporal Douglas R. Brose, Corporal Robert L. Murray and Trooper David Seip [Doc. No. 64] is **GRANTED IN PART** and **DENIED IN PART** as follows:

> **A.**   Any and all claims against Corporal Laura Bowman, Corporal Gary Dance, Corporal Robert Murray, Trooper David Seip and Captain Robert B. Titler are **DISMISSED WITH PREJUDICE** in accordance with Fed. R. Civ. P. 41(a)(2). Any and all claims against all Defendants advanced pursuant to 42 U.S.C. §§ 1985(3) and § 1986 are also **DISMISSED WITH PREJUDICE** pursuant to Fed. R. Civ. P. 41(a)(2);

> **B.**   The Motion for Summary Judgment is **GRANTED** insofar as it relates to any and all state law claims against all Defendants.  Judgment is entered in favor of all Defendants and against all Plaintiffs on all state law claims;

> **C.**   The Motion for Summary Judgment is **DENIED WITHOUT PREJUDICE** insofar as it relates to the 42 U.S.C. § 1983 claims against Commissioner Paul J. Evanko, Deputy Commissioner Thomas Coury and Major Hawthorne Conley;

> **D.**   The Motion for Summary Judgment is **GRANTED** as to Plaintiffs' Failure to Screen in Hiring Claims.  Judgment is hereby entered in favor of Defendants and against Plaintiffs Denise Maslow, Linda Weller and Nancy Doe on those claims;

> **E.**   The Motion for Summary Judgment is **DENIED** insofar as it relates to the supervisory liability claims against Major Robert G. Werts, Captain Thomas J. LaCrosse, Lieutenant David B. Kreiser and Sergeant Kevin T. Krupiewski;

> **F.**   The Motion for Summary Judgment is **DENIED** insofar as it relates to the civil

conspiracy claims against Captain Thomas J. LaCrosse, Lieutenant Dennis Hunsicker and Corporal Douglas R. Brose and **GRANTED** insofar as it relates to the civil conspiracy claims against all other Defendants.  Judgment is entered in favor of Defendants on all civil conspiracy claims except those advanced against LaCrosse, Brose and Hunsicker;

      **G.**  The Motion for Summary Judgment is **DENIED AS MOOT** insofar as it relates to the claims of Plaintiffs Mary Doe and L.H. due to the settlement of those claims;

      **H.**  Defendants' Motion for Summary Judgment is **DENIED** in all other respects.

    **(3)** The Motion for Stay of Trial of Defendant Lieutenant Dennis Hunsicker [Doc. No. 78] is **DENIED WITHOUT PREJUDICE** to re-file the Motion after the case is listed for trial.

    **(4)**  The Motion of Plaintiffs Denise Maslow, Linda Weller and Nancy Doe  to Supplement the Record [Doc. No. 87] is hereby **GRANTED**.  Plaintiffs may supplement the record with the Bureau of Professional Responsibility documents attached to the <u>Haber</u> Civil Action Complaint. The Court's June 17, 2003 Memorandum Opinion and Order in <u>Haber v. Evans</u>, No. 03-CV-3376 requiring partial redaction of the names and other identifying information of certain victims and witnesses will apply to all filings in the above-captioned case.

    **(5)**  The Second Motion of Plaintiffs Denise Maslow, Linda Weller and Nancy Doe  to Supplement the Record [Doc. No. 91] is hereby **DENIED AS MOOT**.

    It is so **ORDERED**.

                                _____**BY THE COURT:**



                                _____

                                **CYNTHIA M. RUFE, J.**